310 P.2d 266

Dale CAMPBELL, Plaintiff, Appellant and Cross-Appellee,

v.

Imogene S. CAMPBELL, Defendant, Appellee and Cross-Appellant.

No. 6030.

Supreme Court of New Mexico.

Jan. 4, 1957.

Rehearing Denied May 13, 1957.

Lynell G. Skarda, Clovis, for appellant.

E. P. Ripley, Santa Fe, Wesley Quinn, Clovis, M. E. Noble, Las Vegas, for appellee.

McGHEE, Justice.

The plaintiff, Dale Campbell, was awarded a divorce from the defendant, Imogene S. Campbell. Incident to this action the lower court made a determination of the character of ownership of property in the possession and control of the plaintiff, finding that certain of it was the community property of the parties and that the remainder was the separate property of the plaintiff. The plaintiff brought this appeal from the decision of the court below and the defendant has cross-appealed. The parties will be designated as they appeared below.

It may be stated generally that the plaintiff contends all of the community assets acquired by the parties were more than consumed by their living expenses and all remaining assets are his sole and separate property, acquired originally by way of gift from his father, G. A. Campbell, or with proceeds from property so given, no portion of which may be attributed to plaintiff's efforts, skill or labor.

In opposition, the defendant urges that substantially all of the property in controversy is community property and plaintiff's evidence was not sufficient to establish its separate character.

There is no issue here respecting the award of divorce or the custody and support of two minor children of the parties.

Plaintiff and defendant were married in 1931. At that time, and afterward, the plaintiff's father was a successful business man in Clovis, New Mexico. He was then the sole owner of the Clovis Coca-Cola Bottling Company and at the time of the marriage the plaintiff was employed by that company for a monthly salary of approximately $150, in which employment he continued for several years.

Although the Coca-Cola company until its sale in 1951 was always owned by the Campbell family, the interests of the owners varied over the years. The history of this business will be of particular concern when we come to examine defendant's contentions on the cross-appeal, but it is sufficient to note at this point that plaintiff first acquired an interest in the company in 1933 when it was incorporated and subsequently he became interested in it in partnership with his father.

The plaintiff also acquired interests in two other companies initiated by his father, a wholesale beer company and a creamery. The creamery was the first business undertaking of the father. In addition to its operation, and following repeal of prohibition, he started the beer company in 1933 or 1934. Both of these businesses were conducted under the father's sole ownership until 1937 when the plaintiff acquired an interest in the beer company which, in 1942, he exchanged for an interest in the creamery business.

Again, as with the Coca-Cola company, the history of the acquisition and ownership of plaintiff's interests in these concerns must be the subject of detailed consideration under one of defendant's points on her cross-appeal.

All of the businesses were quite profitable and served as the major source of plaintiff's income. During the years of the marriage the plaintiff acquired extensive holdings described briefly as follows: The former residence of the parties in Clovis, and its furnishings; plaintiff's interest in a balance of $170,000 due on a promissory note secured by chattel mortgage executed by one G. C. Kerley in connection with his purchase of the Coca-Cola business in 1951, which purchase did not include the lots and building it occupies; an undivided one-half interest in the Campbell Building Company, its assets being the Coca-Cola building and lots; certain promissory notes other than the Kerley note already described; an interest of 26.83 per cent in the creamery business (Campbell Dairy & Ice Cream Co.); a ranch located northwest of Tucumcari, New Mexico, and cattle thereon; lots and buildings in Clovis and Tucumcari; proceeds from a federal income tax refund; 300 shares of common stock in the Squirt Corporation; three automobiles; seven policies of insurance upon the lives of the parties and their children; and three cash and savings bank accounts.

The lower court did not make division of these properties, but expressly found the evidence failed to disclose the market value of a large part of the property and concluded no equitable division of the community property could be made without further evidence or agreement between the parties as to valuation.

The trial court found and adjudged the following to be the separate property of the plaintiff:

(1) An undivided 26.83 per cent interest in the Campbell Dairy & Ice Cream Co., a partnership.

(2) An undivided ⅙ interest in the Campbell Building Co., acquired in 1950. (Plaintiff actually owned a ½ interest in this company, but the court held a ⅓ interest acquired in 1940 was community property.)

(3) All plaintiff's interest in the Kerley promissory note secured by chattel mortgage, given for the sale of the Coca-Cola business.

(4) All plaintiff's interest in a promissory note executed in 1954 by Earl O. Woody and N. A. Bowman in the principal sum of $3,219.29, together with security, which note was given to plaintiff upon the sale of fixtures and equipment in the Central Bar at Tucumcari.

(5) One automobile.

The trial court held all the remaining properties were community property.

In the interests of clarity, we will first consider defendant's cross-appeal which urges error was committed by the trial court's refusal to find plaintiff's interest in the Kerley note, his interest in the Campbell Dairy & Ice Cream Co., and his ⅙ interest in the Campbell Building Co. acquired in 1950 constituted community property; for, if it be determined that defendant should prevail in these contentions, or any of them, such determination will have bearing upon the issues raised by plaintiff's appeal asserting the error of the trial court in finding that any of the property belonged to the community.

Before considering the cross-appeal, however, it seems necessary that we review to some extent the history of the general presumption of community property prevailing in this state and attempt to set at rest the nature of its force and effect, as it is argued by both parties that the presumption is of key significance in the case, each seeking a different effect to flow from it.

The plaintiff points to the trial court findings where first one piece of property and then another was found to have been acquired by purchase during the marital relation and found to be community property; then, reference is made to finding of fact No. 33 where it was declared with respect to some twelve items of property "That the evidence adduced by the plaintiff does not rebut the presumption that said properties are community property." He suggests the trial court must have been of the view the presumption was conclusive of the issue.

While plaintiff's first point on this appeal is framed in language seemingly posing the question whether the general presumption the presumption is merely an evihe is really contending for is a declaration is "conclusive" or "inconclusive," what dentiary one, as distinguished from that class of presumptions which are considered to be rules of property. In other words, he would have us state the law to be the presumption goes "out the window." asserting separate ownership the burden of producing a preponderance of evidence to establish that fact, and, further, that after the production of such evidence the presumption simply places upon the one

The defendant, on the other hand, argues the presumption is a rule of property; that it is a form of evidence sufficient in itself to support a finding of fact in accordance therewith—that standing alone it creates a conflict with evidence of separate ownership; and, finally, that the presumption can only be overcome by "clear, strong and convincing evidence."

There is no question but that the defendant relied on the presumption, for there is no evidence that she had knowledge of or was active to any degree in her husband's business and financial transactions.

Therefore, aside from the books and records reflecting a substantial part of the plaintiff's business affairs, which were made available to a firm of accountants employed by the defendant and their testimony regarding these records, she had little evidence to offer, though it may be noted here that she does place reliance upon the circumstances of the presence of income tax returns for the community, the absence of gift tax returns, and certain features of the relationship between the plaintiff and his father and the latter's business policies with respect to his family. All of these matters will be the subject of further consideration in later portions of this opinion.

■ The presumption that all property acquired after marriage is community property was part of Spanish community property law and was recognized as an element of the community property system in this state prior to the time of its statutory pronouncement by § 10, ch. 37, Laws of 1907. Neher v. Armijo, 1898, 9 N.M. 325, 54 P. 236; Strong v. Eakin, 1901, 11 N.M. 107, 66 P. 539; Brown v. Lockhart, 1903, 12 N.M. 10, 71 P. 1086.

By the Laws of 1947, ch. 191, § 1, the 1907 statute was amended, but the only change in the portion of the law declaring the community property presumption was the inclusion of the words "real and personal" therein. As amended the section reads, in pertinent part:

"All other real and personal property acquired after marriage by either husband or wife, or both, is community property; * * *" § 57–4–1, N.M. S.A. 1953.

This section is preceded by sections 8 and 9, ch. 37, Laws of 1907, which provide, respectively:

"All property of the wife owned by her before marriage and that acquired afterwards by gift, bequest, devise or descent, with the rents, issues and profits thereof is her separate property. The wife may without the consent of her husband convey her separate property." § 57–3–4, N.M.S.A. 1953.

"All property owned by the husband before marriage, and that acquired afterwards by gift, bequest, devise or descent, with the rents, issues and profits thereof is his separate property." § 57–3–5, N.M.S.A. 1953.

■ While the general presumption of community property is certainly not conclusive, see cases cited supra, as well as In re Faulkner's Estate, 1930, 35 N.M. 125, 290 P. 801, and Katson v. Katson, 1939, 43 N.M. 214, 89 P.2d 524, the textwriters treat it as a rule of property rather than of evidence. McKay, Community Property (2d Ed., 1925) § 223; 1 de Funiak, Principles of Community Property (1943) § 60; Clark, Presumptions in Community Property, 25 So.Cal.L.Rev. 149, at pp. 171, 172.

The question of the force of the presumption was noticed in Albright v. Albright, 1916, 21 N.M. 606, 157 P. 662, 663, Ann.Cas.1918E, 542, where it was held the uncorroborated evidence of the husband was sufficient to sustain a finding of the trial court that real estate standing in the name of his wife at the time of her death was community property. Because of the presumption also contained in § 10, ch. 37, Laws of 1907, that title to property conveyed to a married woman by instrument in writing is thereby vested in her as her separate estate, the husband assumed the burden of proof of the community character of the property. Of this circumstance the Court said:

"Because of this statute appellee assumed the burden of proof in the trial court upon the theory that the above statute [§ 1, ch. 37, Laws 1907] was only a rule of evidence; that the presumption which had theretofore existed that all property found in the name of either spouse during marriage was prima facie common could be changed, at will, by the Legislature, without affecting any vested rights. Both parties seemingly concur in this rule; hence we are not required to decide whether he rightly assumed the burden. McKay, in his book on Community Property, in discussing this presumption, says:

" 'The rule as thus stated is something more than a mere rule of evidence; it becomes a rule of substantive law—of property right. Under the rule in this form—and this is the form in which it is actually administered—the ownership of everything in possession of either spouse during marriage rests upon a basis more firm than a mere presumption; it is common unless a better separate right can be satisfactorily shown. This is a rule of property law, not of evidence merely; the apparent ownership of all property may be modified by proof of rights in others.' "

It cannot be said that upon the mere introduction of testimony to rebut the presumption that the presumption is no longer to be considered of any force and effect. Instead, the contestant asserting the separate character of the property has not only the burden of going forward with his evidence, but of establishing separate ownership by a preponderance of evidence. Shanafelt v. Holloman, 1956, 61 N.M. 147, 296 P.2d 752, and cases collected there.

Preponderance of the evidence simply means the greater weight of the evidence; but upon appeal the question whether the presumption has been overcome as a matter of law depends upon whether there is substantial evidence to support the finding

of the trial court. The cases are numerous which hold the substantial evidence rule applies in such case, as does the usual appellate rule of indulging all presumptions in favor of the judgment. Fullen v. Fullen, 1915, 21 N.M. 212, 233, 234, 153 P. 294; Trigg v. Trigg, 1933, 37 N.M. 296, 22 P. 2d 119; Sands v. Sands, 1944, 48 N.M. 458, 152 P.2d 399; McElyea v. McElyea, 1945, 49 N.M. 322, 163 P.2d 635; Shanafelt v. Holloman, supra.

In California a number of decisions state the rule that the presumption of community ownership is alone sufficient to raise a conflict in the evidence and a finding of the trial court in accordance with it will not be overturned on appeal. Wilson v. Wilson, 1946, 76 Cal.App. 119, 172 P.2d 568; Rahr Malting Co. v. Koch Brewing Co., 1935, 9 Cal.App.2d 457, 50 P.2d 476, 477; In re Gartland's Estate, 1931, 114 Cal.App. 269, 299 P. 757; McAlvay v. Consumers' Salt Co., 1931, 112 Cal.App. 383, 297 P. 135; Stafford v. Martinoni, 1923, 192 Cal. 724, 221 P. 919.

An examination of these cases reveals that in most of them, if not all, other circumstances or evidence in the case, while perhaps not sufficient to impeach or otherwise discredit the testimony of separate ownership, did suffice to cast the matter in doubt.

While it appears that this California rule would logically follow our holding the presumption is a rule of property, and our decision in Weeks v. Bailey, 1928, 33 N.M. 193, 263 P. 29, (a case involving the issue of delivery of a deed, where it is declared that a legitimate presumption, like circumstantial evidence, is sufficient on appeal to sustain the finding of the trial court); we think it unnecessary to declare the rule in this case, believing that earlier decisions of the Court in the cases of Loveridge v. Loveridge, 1948, 52 N.M. 353, 198 P.2d 444, 446, and In re Faulkner's Estate, supra, afford a sufficient basis for deciding the present issues.

In the Loveridge case it is said:

"It is, of course, often difficult, sometimes even impossible, to determine from the evidence whether a given piece of property is separate estate or community in character. If acquired subsequent to marriage, it is naturally presumed to be the latter. Barnett v. Wedgewood, 28 N.M. 312, 211 P. 601; Carron v. Abounador, 28 N.M. 491, 214 P. 772. Hence, in the case at bar, entertaining ultimate doubt, the trial court may resolve the doubt by holding the property to be community in character, if acquired after marriage. * * *"

In the Faulkner case it was held error for the trial court to rule property was community property where the only testimony of positive character in the case

was as to its separate nature, which testimony stood unimpeached by any suspicious circumstances. The Court there expressed its reluctance to lay down any rule to govern future controversies, but it cannot be gainsaid that the case stands at least for the proposition this Court may declare the presumption of community property has been overcome by clearly preponderating evidence of separate ownership, despite a finding of the trial court to contrary effect.

Adhering, then, to the principles of these cases, it may be said that when evidence in the case casts doubt upon the issue, a finding of community ownership will be upheld as supported by substantial evidence. In counterpart, when the evidence of separate ownership is clear and no evidence aside from the presumption exists to the contrary, circumstantial or otherwise, a finding of community ownership should be overturned upon appeal as not supported by substantial evidence.

The defendant urges that evidence in support of a finding of separate ownership to be deemed substantial must meet the test of being "clear, strong and convincing." Reliance is placed upon our decision in In re Trimble's Estate, 1953, 57 N.M. 51, 253 P.2d 805, 808, and the early case of Neher v. Armijo, supra.

The New Mexico decisions abundantly establish the rule that proof to overcome the presumption of community ownership need only amount to a preponderance of the evidence.

While one of the Court syllabi in the case of Neher v. Armijo, supra, states the presumption may be overcome by clear and conclusive proof to the contrary, the opinion actually employs the test of preponderance of evidence. Evidence of separate ownership was examined and declared to constitute clear and conclusive proof the property in question did not belong to the community, but the case is not authority for the proposition the presumption can *only* be overcome by clear and conclusive proof.

In Shanafelt v. Holloman, supra [61 N. M. 147, 296 P.2d 756], the Court, speaking through Mr. Justice Kiker, said of the same contention made there under the Trimble case:

"* * * The Trimble case was dealing with an apparently attempted transmutation of community property into real estate to be held in joint tenancy. The court held, Justice Sadler dissenting, that in order to effect the change, clear, strong and convincing evidence must be adduced as to the intention of the parties. The court also held that the evidence in that case did not meet the quantum of proof required.

"We are not dealing here with a situation such as that which existed in Re Trimble's Estate, supra. We are dealing with the original acquisition of real estate where the testimony is conflicting as to the funds with which it was purchased. * * *

"Where the acquisition of property has been involved, this court has stated in several cases that the presumption of community property may be overcome by a preponderance of evidence. [Citing numerous cases.]"

The contention is ruled against defendant.

### The Cross-Appeal

The defendant first contends the trial court erred in finding that the promissory note given by G. C. Kerley when he purchased the Clovis Coca-Cola business, on which at the time of trial there remained an unpaid balance of $170,000, payable $12,500 annually, was the separate property of the plaintiff to the extent of his former interest in the business sold.

In 1913 the plaintiff's father, G. A. Campbell, was engaged in the business of bottling soft drinks in Clovis, New Mexico, at which time he was approached to take the Coca-Cola franchise for that area. He was not particularly interested in the acquisition, but finally accepted it, paying nothing therefor. The business continued under his sole ownership until 1933 when it was incorporated under the name, Clovis Coca-Cola Bottling Company, the purpose for incorporation being to insure the perpetuation of the Coca-Cola franchise in the corporation (and the Campbell family) in the event of G. A. Campbell's death.

At the time of incorporation plaintiff had been employed by the business for some three years, during which period he and the defendant were married. He was paid a salary of approximately $150 a month. Upon incorporation, out of a total issue of 223 shares of stock, the plaintiff received one share and the office of secretary-treasurer, his father held 221 shares and was corporate president, while the remaining share was held by Mrs. G. A. Campbell, the plaintiff's mother, who was designated vice-president. At that time the book value of the corporation was $22,300, the par value of each share of stock being set at $100.

From the time of incorporation until sale of the business in 1951, numerous changes were made in the corporate stock structure. Changes were also made over the years in the way the business was conducted, it being operated sometimes under a partnership by contract with the corporation and at other times directly under the corporation, depending upon which method happened to be most advantageous financially.

The first substantial interest of the plaintiff in the bottling company was acquired

in 1937 when he and his father, in partnership, contracted with the corporation to purchase the drink from it at cost plus one cent per case profit, the partnership to make all re-sales and distributions of the drink which the corporation made and advertised. At this time the corporate stock was reduced from $75,000 to $4,000 (which latter sum represented the cost of a Coca-Cola franchise acquired for the area of Tucumcari, New Mexico) by transferring all of the assets of the corporation, exclusive of the Tucumcari and Clovis Coca-Cola franchises, to the partnership. The shares of corporate stock were reduced from 223 to 40, of which the plaintiff held one, his mother held one and the remainder were held by the father.

The foregoing matters are reflected by a certificate of stock reduction and by the contract between the corporation and the partnership recited in the corporate minutes for May 6, 1937. The plaintiff testified he did not know whether or not he had a written agreement with his father in respect to the partnership. If such agreement existed, it was not in evidence.

Upon the basis of this transaction the defendant argues, and we quote from her brief-in-chief on cross-appeal:

"This partnership has acquired the assets of the corporation in consideration of their contract obligation with the corporation to purchase, sell and distribute Coca Cola products throughout the territory. There can be no question but that this transaction was one of purchase for a valuable consideration and no parol evidence is competent to vary or alter the written agreement as it appears in the record. Since no evidence was submitted of any prior assets owned by the partnership or of any capital contributions by either of the partners, it must be assumed that the partnership started from scratch with each of the partners having an equal share in the partnership. It is indisputable that (plaintiff) acquired his first interest in the partnership by way of purchase. The consideration was the services he contracted to perform. The evidence cannot be construed in any other way, and there is absolutely no evidence of any gift."

To this argument the plaintiff responds that his father testified that he (plaintiff) paid nothing for his interest; that defendant's accountant testified there was no evidence that plaintiff paid anything for his share in the company and that there was nothing listed among the checks on plaintiff's bank account to show any payment; that the partners certainly did not start from "scratch" because according to the corporate records, at the end of 1936 the corporation had $22,900 in capital stock, paid-in surplus and earned surplus; that after the stock reduction the corporation

had a total capital of $7,781.40; the balance of the assets went to the partnership; that he had no money to purchase a one-half interest in these assets for the parties' living expenditures through 1937 exceeded not only his salary, but dividends and profits as well, from the bottling company; that the contract between the partnership and the corporation was a mere operating agreement and the matters undertaken to be done by the partnership did not constitute a consideration for the transfer of the corporate assets.

Plaintiff sums up his argument in support of the finding of separate property by stating that it simply cannot be explained how a man performing the ordinary and customary duties of working in a Coca-Cola plant could by his labor, skill and industry, after six years, purchase in the true sense a one-half interest in that company's assets.

Aside from the evidence regarding the formation of the partnership of the plaintiff and his father in 1937, the defendant challenges the correctness of the trial court's ruling on the basis of the following evidence and circumstances:

(1) In 1938 a new partnership for the operation of the business was established, composed of the plaintiff, his father, and his sister. Article IV of the partnership agreement provided:

"That the capital of said partnership shall be $24,810.01, which shall stand to the credit of the partners as follows:

| | | |
|---|---|---|
| G. A. Campbell | $16,201.65 | Credit |
| Dale Campbell | 7,580.47 | Debit |
| Dona Campbell | 16,188.79 | Credit |
| | | |
| Total | $24,810.01" | |

There was no showing of the source of the funds used to pay plaintiff's debit.

The defendant maintains that on the basis of this statement of account, the absence of evidence as to the profits of the original partnership and the nature and source of the credits in the second partnership, and the fact that during 1937 and 1938 the plaintiff reported all income from the Coca-Cola activities as community income, that the plaintiff was legally indebted to the new partnership in the sum of $7,580.47; that it must be assumed such amount was paid, there being no evidence to the contrary; and that the whole transaction is inconsistent with a gift.

(2) No gift tax return covering the transaction was introduced in evidence and upon advice of counsel the plaintiff's father refused to execute a power of attorney allowing the defendant to examine government records of gift tax reports as to whether any had been filed or not, nor would he enter into a stipulation as to what had been filed. Plaintiff's counsel did agree

that gift tax reports on file, as distinguished from government records, might be examined; but it is asserted and uncontradicted that the federal government destroys gift tax reports after five years.

Defendant asks us to take judicial notice that if plaintiff's interest was acquired by gift, a gift tax return should have been made. She further argues that since the plaintiff's father refused access to government records which would show whether a return had been filed or not that the conclusion must follow none was filed.

(3) Defendant also seizes upon the circumstance that plaintiff's tax report covering the sale of his interest in the Coca-Cola company to Kerley in 1951 listed his stock as having been acquired at a cost of $17,748.28.

With respect to defendant's contentions under paragraph (1) above the plaintiff presents argument that, after all, he owned one-half of the partnership assets before his sister became a partner under the new arrangement; that thereafter he only owned one-third of the business—in other words, that he relinquished to his sister a one-sixth interest in the partnership; that she had formerly had no connection with the business and that neither he nor his father, or the partnership, received anything from her when she became a partner. The plaintiff points to testimony of his father that he wanted to treat his children

equally as the reason the sister was taken into partnership and given her one-third interest. He says further that it is immaterial that his income from this partnership and its predecessor was reported as community income for the question is not as to the character of the income, but the character of his interest in the business and its assets.

Regarding defendant's argument under paragraph (2) above, the plaintiff says the fact of absence of a gift tax return covering the transaction has no evidentiary value because at the time he acquired his interest in the company the structure of federal gift tax legislation was such that allowable exemptions far exceeded anything he acquired.

In answer to paragraph (3) above the plaintiff explains his tax report covering the sale of his Coca-Cola interests to Kerley contained the statement his stock was acquired at a cost of $17,748.28 simply as the basis for calculating his long-term capital gain—that the figure included the par value of his then stock and his share of the paid-in surplus which went from the partnership back into the corporation some time before the sale.

Before disposing of these contentions the remaining history of the company should be briefly traced. In 1939 the corporation took over the partnership assets and the plaintiff was given 13 shares out of a total stock re-issue of 40 shares, at

which time he acquired his basic interest in the Coca-Cola franchises. In 1944 a new and third partnership was formed to operate the business under a sub-bottler's contract, the partners being the plaintiff, his father, and his sister's husband. In this partnership the plaintiff owned 34 per cent of the assets and profits. In 1948 the father gave the plaintiff two more shares of the corporate stock, for which gift tax returns were filed. The purpose of this gift was to insure the plaintiff would have control of the business if the father died. In 1950 the sister's interest in the corporation was relinquished in exchange for the Tucumcari Coca-Cola franchise and business and a cash payment, in order that she might have her own separate business, the last partnership was dissolved and everything went back to the corporation where it remained until the business was sold. At the time of the sale, plaintiff owned 15 shares of stock and his father and mother together owned 12, but the father refused to sell unless he received 50 per cent of the sale price, to which the plaintiff agreed.

■ Giving due consideration to the contentions of the parties, and guided by pertinent community property principles already noted or set forth in later portions of this opinion, we can only conclude the ruling of the trial court that plaintiff's interest in the Kerley promissory note and its security is his sole and separate property is supported by substantial evidence.

■■ It is true that the corporate records do not establish the fact of gift ; but, in addition to the testimony of the plaintiff and his father that a gift was made, which testimony is certainly admissible and must have some probative force, there are all of the circumstances pointed to by the plaintiff. He had no money to purchase a one-half interest in the 1937 partnership for all available funds up to that time had more than been expended in the purchase of a home and general living costs. At the time of the stock reduction, the balance of corporate assets not accounted for must have gone into the partnership. The plaintiff's interest in the corporation having theretofore been one share of stock out of a total of 223 was exceedingly limited and the operating capital of the partnership must have been derived from the father, through the corporation. Lastly, and perhaps most persuasive is the fact that plaintiff's sister was taken into the partnership on an equal basis with the father and the plaintiff and there is no evidence she made contribution of either capital or services for such interest, aside from the declaration in the articles of the second partnership as to the capital account of the members. So far as the sister is concerned such statement may as easily have been a declaration of ownership by gift as by purchase, standing as

it does devoid of any other evidence. It is nowhere contended that the plaintiff received anything when he relinquished to his sister a one-sixth interest in the partnership. We think it far more likely that such a relinquishment would be made of property given to the plaintiff, in cooperation with the father's desire, as he testified, to treat his children equally, than would be the case if plaintiff had in fact acquired his one-half partnership interest by purchase.

■ ▉ That plaintiff's income from the Coca-Cola enterprise was reported as community income is no more than a factor to be considered in connection with other evidence in the case. Porter v. Porter, 1948, 67 Ariz. 273, 195 P.2d 132; Kenney v. Kenney, 1954, 128 Cal.App.2d 128, 274 P.2d 951. It certainly does not conclude the question of ownership of the property itself, as distinguished from income. Katson v. Katson, supra. In view of the personal services plaintiff rendered to the partnerships and the corporation, a portion of his income, of necessity, belonged to the community.

It is not necessary to determine whether a gift tax return should have been made. It is reasonable to assume if one had been made it would have been produced, but its absence from the case, like the presence of income tax returns, is simply a circumstance in the proof. Even if a tax return should have been made, failure to do so could hardly conclude the issue and defendant cites no authority to that effect.

The explanation of the plaintiff of the tax return covering the sale of his interest to Kerley showing his stock was acquired at a cost of $17,748.28 is sufficient.

In view of all the evidence, we think the statement of capital account of the second partnership stands for no more than it says—that the plaintiff's capital account was deficient by $7,580.47, and it does not establish the purchase of interest by him. Indeed, he already owned a one-half interest before the formation of the second partnership. Although plaintiff did not offer an explanation of the reason for this deficit, it is established that in 1937 the plaintiff drew $10,720.90 from the Coca-Cola company for the purpose of financing the cost of his residence (see discussion of acquisition of residence infra), and it is most likely this circumstance gave rise to the deficit.

▉ The contention of the defendant that plaintiff acquired his interest in the business through a series of complete, valid, written contracts of purchase and that he cannot now offer parol evidence that such acquisitions were in fact by gift just does not fit this case. The plaintiff's original substantial interest was not acquired by written agreement under the proof made. Furthermore, the authorities relied upon by defendant for this proposition are cases

where one party to a contract sought to rely thereon and another party to the contract sought to alter its written effect. See, for example, Bell v. Lammon, 1947, 51 N.M. 113, 179 P.2d 757; Davis v. Campbell, 1948, 52 N.M. 272, 197 P.2d 430. No authority is cited that litigation to determine whether property is separate or community in nature is controlled by the parol evidence rule under such circumstances.

It follows that the first point on defendant's cross-appeal must be ruled against her.

The subject of defendant's third point on cross-appeal is the lower court erred in holding an undivided one-sixth interest held by plaintiff in the Campbell Building Company, acquired in 1950, was his separate property. The assets of this company are the land and building housing the Clovis Coca-Cola business, assets not included in the sale to Kerley.

It will be recalled that the plaintiff's sister surrendered her interest in the Clovis Coca-Cola corporation in exchange for the Tucumcari Coca-Cola franchise and assets and a cash payment. In order to equalize the exchange she deeded her one-third interest in the Campbell Building Company to her father and the plaintiff. It is the one-sixth interest the plaintiff acquired thereby with which we are now concerned.

It is agreed by the parties that whether plaintiff's one-sixth interest in this company and its assets is separate or community property depends upon whether his interest in the Kerley note and his precedent interest in the Coca-Cola company were separate or community holdings. As we have held there is substantial evidence to support the trial court's finding the latter interests were plaintiff's separate property, and as the one-sixth interest in the Campbell Building Company was received in exchange for a portion of his interest in the Coca-Cola business, it necessarily follows this interest is likewise plaintiff's separate property.

By her second point on cross-appeal defendant challenges the finding of the trial court that plaintiff's interest in the Campbell Dairy & Ice Cream Co., in Clovis, New Mexico, is his separate property.

The plaintiff acquired his interest in this business on January 1, 1942, in exchange for his capital account in the Clovis Beer Co. There is no dispute as to the general facts of acquisition, only as to their effect upon the character of ownership. Also, it is not disputed that if plaintiff's interest in the beer company was his separate property, then the interest in the creamery business received in exchange therefor, is likewise his separate property.

In order to state the issue in brief form, use is made of the résumé of the history of these two businesses as it appears in plaintiff's answer brief on cross-appeal, set forth

in numbered paragraphs. Following these numbered paragraphs we have inserted, where necessary, parenthetic material showing the defendant's additions to or interpretation of the facts.

1. Plaintiff's father, G. A. Campbell, established the Campbell Dairy & Ice Cream Co. in 1908, operating it as a sole proprietorship until Harold Murphy became manager and a partner in 1938.

2. The Clovis Beer Co. was started in the latter part of 1933 with G. A. Campbell being the sole owner. The company was operated as his sole proprietorship.

3. On January 1, 1937, G. A. Campbell gave plaintiff a one-third interest in the profits from the business.

(On January 1, 1937, the plaintiff and his father entered into a *partnership,* plaintiff to have a one-third share of the profits. When the partnership was started the father advanced to it $16,219.18, either in cash or fixed assets.)

4. From 1937 through 1941 plaintiff only withdrew $1,310.00 of the profits, and since his unwithdrawn profits were credited to his capital account he had $15,822.21 in the capital account.

(The partnership of the plaintiff and his father operated during the years, 1937, 1938, 1939. In 1938 the father withdrew fixed assets or capital advanced by him of the value of $15,-653.38. In 1939 the father withdrew fixed assets of the value of $832.40; or, as totaled, $226.00 more than his original capital advance of $16,219.18.

(The partnership had total profits during the three year period of $33,-484.08, two-thirds of which was credited to the father, who withdrew from his share $24,505.50.

(During the years 1940, 1941, plaintiff's sister was a member of the partnership with plaintiff and the father.)

5. On January 1, 1942, plaintiff's capital account of $15,822.21 was exchanged for the same amount of capital account in the Campbell Dairy & Ice Cream Co.

6. Plaintiff left all of his income in the Campbell Dairy & Ice Cream Co., so that his profits were credited to and increased capital account until it grew to be about 57% of the total capital. Plaintiff then sold to his sister, Dona Campbell Dickinson, approximately 23% of his interest so that they had the same capital account in the Dairy.

a. Dona's note to plaintiff was paid off by forgiveness of two payments while her husband was in military service, and she borrowed money to pay off the balance.

b. At time of trial plaintiff and his sister owned 26.83% of the Campbell Dairy & Ice Cream Co., G. A. Campbell owns 32%, and Harold Murphy owns 13.94%.

The contention of the defendant is clear: When the plaintiff acquired his interest in the beer company, he and defendant were husband and wife, therefore, the general presumption of community ownership applies. The books and records of the partnership (there being no formal articles) show it began business with $16,219.18 capital, which sum was loaned to the partnership by the father and withdrawn from the partnership by him during the years 1938 and 1939. No contributions of capital are shown to have been made by either partner. The father did not give plaintiff anything except the opportunity to go into business. The partnership began from "scratch", operating on capital borrowed from the father. There is no evidence of a tangible gift and the mere opportunity to participate in profits is not property in the legal sense and cannot be the subject of gift, being incapable of delivery.

The extent of plaintiff's participation in the partnership is the subject of some controversy. The father testified:

"Q. How much interest did you give him? A. One-third.

"Q. Do you know about when that was given to him? A. Somewhere around 1937, I am not positive but I believe it was 1937, it could have been 1938.

"Q. Did he pay you anything for it? A. Not one cent.

"Q. Who ran the Clovis Beer Co.? A. I did, I ran the Clovis Beer Co.

"Q. Did you have any manager? A. At times, yes.

"Q. Who did you have? A. Bill Crawford, and then later on, just about the time the legalized sales were closed here, B. P. Bozeman.

\*    \*    \*    \*    \*    \*

"Q. Did Dale (plaintiff) take any active part in the management of the Clovis Beer Co.? A. No, sir, just an assistant, you know an assistant to me.

"Q. He did whatever you told him? A. He did whatever I told him, if I wanted the floor swept, I said, sweep the floor son."

Plaintiff does not dispute that he was a partner in the business. He says in his brief:

"Of course cross-appellee could order beer, he could sell beer, he could give away his interest, or he could do anything else, because he was a partner in the business. It requires no citation of authority for the proposition that a partner in a business can

bind the partnership. It is not a question here of what was the extent of cross-appellee's authority, but rather the question is what did he in fact do by way of labor, skill or industry."

Plaintiff then points to the following testimony given by him as to his participation:

"Q. Did you place any capital in the Beer Co.? A. No, sir.

"Q. How did you get your interest in the Beer Co.? A. It was just given to me.

"Q. Who gave it to you? A. My father.

"Q. Did you ever perform any labors or services for the Beer Co.? A. No, sir.

"Q. Why didn't you? A. I was working over in the Coca-Cola plant.

"Q. Who took care of the Clovis Beer Co. business? A. My father and Mr. Crawford.

"Q. Who was Mr. Crawford? A. That was a boy that had been working for us for some time.

"Q. What was his— A. He was the manager or foreman I would say.

\* \* \* \* \* \*

"Q. Did he work for the Clovis Beer Co. throughout its existence? A. No, he worked practically all of it, of course he worked for it all the time

that I was in there, but later on Mr. Bozeman was there some as manager."

Plaintiff also relies upon the testimony of his father as to the value the beer company had prior to the creation of the partnership:

"Q. Now, actually what value did that have at the time Dale (plaintiff) came into the picture at the Clovis Beer Co.? A. Oh it had considerable value.

"Q. How much? A. Five or six running there.

"Q. How much value did it have? A. Oh, I would hardly know, several thousand dollars.

"Q. Can you estimate? You say he came into it in 1937. A. Yes.

"Q. And it had been operating you say 1933 or 1934? A. Oh, I would say forty or forty-five thousand dollars, something like that.

"Q. Forty or forty-five thousand dollars? A. Yes, sir.

\* \* \* \* \* \*

"Q. Of what did that consist, Mr. Campbell? A. Well, it consisted of a stock of beer and the trucks and the cold storage and the warehouse and the beer coolers and everything else it takes to handle beer with, license and insurance and anything else."

With respect to taxation, from 1937 through 1941 the plaintiff reported the income from the partnership as belonging to the community. After he acquired his interest in the creamery business, he likewise reported his profits from that source as community income. No gift tax return covering his acquisition of interest in the beer company was placed in evidence.

The defendant calls our attention to a letter in evidence written in 1946 by an accountant for the father. The letter was in response to an inquiry from the Internal Revenue Service whether the interest of the sister in the creamery business was community property. It was therein stated:

"In reply to your letter of October 1946, I have gone into the matter further with Mr. Campbell and his son Dale Campbell, and his daughter, Dona Dickinson, who are members of the above partnership.

"Although the Campbell children were entitled to obtain the interest, which they did obtain, by gift from their father, they nevertheless elected to acquire it by purchase. Thus it was that father Campbell, rearing his children to learn the value of business and the value of work, achieved his ambition of placing them in business on their own feet."

The plaintiff testified that in 1942 he decided to engage in a retail liquor business and that under regulations of the Division of Liquor Control he could not do so while engaged in the wholesale beer business—that for this reason it was necessary that the beer company partnership be dissolved. The defendant argues that if the only interest the plaintiff had in the beer business had been a gift of one-third of the profits, it would not have been necessary for him to relinquish such interest before he went into the retail liquor business. She also says if plaintiff was simply given a portion of the beer company profits, then the formation of a partnership was a vain and useless act.

The last matter to be noted concerns the interest of the sister in the beer company. The father testified he gave her the interest she had and the plaintiff testified she did not pay anything for it. She retained this interest until under local option the City of Clovis made sales of beer illegal. The father's testimony was:

"Q. What happened to her interest in the beer company when the beer became illegal? A. It just played out and she got the dollars.

"Q. Did you get Dale to give half of his interest to Dona? (The interest referred to is plaintiff's interest in the creamery business.) A. Yes, sir, he did.

"Q. Did Dona ever pay him anything for it? A. Yes, sir.

"Q. How did she pay him? A. She went down to the Bank and borrowed the money and paid him.

"Q. Did Dale give her any credit while her husband was in the service? A. Yes, sir.

"Q. Do you know what that credit amounted to? A. It seems like it was around three thousand dollars a year.

\*　\*　\*　\*　\*　\*

"Q. Do you remember the transaction whereby Dona got an interest in the Campbell Dairy and Ice Cream Company? A. Yes, sir.

"Q. Would you tell the Court about that? A. Well, I have a good many books to look over and I happened to be checking up on things and I saw where he (plaintiff) had fifty-seven percent of the stock in the creamery—

"Q. Do you mean interest? A. Interest.

\*　\*　\*　\*　\*　\*

"A. Anyway, I found out he had that much interest which was more than I had and I said, say wait a minute, that won't do, you are not supposed to own that much of that so I checked up on the books and I found out that instead of his drawing his dividends he put into interest.

"Q. Capital account? A. Capital account, yes, and that is how come it to go to that point.

"Q. What did you do about that Mr. Campbell? A. I said you give half interest in that to your sister or sell it to her or get rid of it.

"Q. Why did you want Dona to have it? A. Because I wanted her to be equal with him, I always tried to treat my kids alike, I like to treat each of them alike, and she didn't have any and he had too much."

The plaintiff's testimony about this occurrence is substantially the same. His sister gave him a note for $14,916.90 for the purchase of her interest in the creamery. He credited her by way of gift with $6,000 and received payment from her for the balance of the note.

■ Considering all of these matters, we are unable to say the finding of separate character of ownership of plaintiff's interest in the Campbell Dairy & Ice Cream Co. is supported by substantial evidence.

Only one circumstance may really be pointed to in support of the separate character of his interest in the beer company, the crucial question here. That is the fact before the partnership between plaintiff and his father was created the beer company had been in existence for some

time and had assets which were estimated at $40,000 or $45,000. But these assets cannot be traced into the books and records of the partnership, unless they, or some portion of them, constituted part of the fixed capital which the father *loaned* to the partnership. There is nothing to show that the partnership acquired any interest in them. So far as the record shows, if the partnership used these assets, and it would logically seem that it did, they remained the property of the father which he simply suffered the partnership to use.

In fact, the plaintiff does not contend that either he or the partnership did acquire any interest in such assets. His contention is that his father gave him a one-third interest in the profits from the beer company. We do not pass upon the question whether such interest could be the subject of gift, under the circumstances described, for conceding that it is possible to effect a gift of this interest, that is not what happened here. Instead a partnership was formed. It began with no assets aside from a loan from one of the partners—a loan thereafter paid back by the partnership. We must agree with the defendant that if this transaction could be called a gift of the right to share in the profits, it was also a gift of the right to share in any losses the venture might have sustained.

The evidence of plaintiff's participation in the business is in some respects contradictory, but we think it can only be said, under interpretation most favorable to plaintiff, that he was a partner with all the powers of a partner. He served as his father's assistant and the business was operated through a manager. His association in it was clearly more than nominal.

Finally, the manner in which plaintiff's sister acquired her interest in these businesses is not persuasive of a donor-donee relationship in the family as it was in the case of the Coca-Cola business, where, as we have seen, the plaintiff relinquished a substantial interest to her by way of gift.

It is true that when the sister was taken into the beer company partnership she made no payment or contribution for her interest, but plaintiff's interest was not diminished to any extent by his sister's entry into the partnership. Furthermore, when the father desired that he reduce his interest in the creamery in favor of his sister, it was arranged that an interest be sold to her.

█ This point is ruled in favor of the defendant.

█ Before proceeding to the contentions made by plaintiff on appeal, we notice that he has renewed his motion to dismiss the cross-appeal upon the ground it was not filed within thirty days of the filing of the transcript and no extension of time was re-

quested of the Court. The motion has heretofore been denied. If Rule 15(8) of our Rules of Civil Procedure (§ 21–2–1 (15) 8, N.M.S.A., 1953) applies to cross-appeals, the rule is not mandatory and the Court has the power to consider the cross-appeal under Rule 16(4) (§ 21–2–1 (16)4, N.M.S.A., 1953).

### The Appeal

Plaintiff makes seventeen points on his appeal. The first eight are devoted to propositions in community property law; the remaining nine constitute attacks upon the trial court's findings of community ownership as to particular properties—in fact, as to all the properties held to belong to the community.

The first point, concerning the force of the general presumption of community ownership has been considered in the forepart of this opinion. Already discussed, too, in connection with the cross-appeal, is plaintiff's seventh point, concerning the effect of income and gift tax returns on proof of method of ownership. Certain other rules of community property law contended for by the plaintiff are not controverted by defendant except as they do or do not have application to this case. These rules are of long standing and may be stated briefly.

The increase in value of separate property produced by natural causes or essentially as a characteristic of the capital investment is separate property. Laughlin v. Laughlin, 1944, 49 N.M. 20, 155 P.2d 1010. The character of ownership of property, whether separate or community, is determined at the time of its acquisition; if acquired as separate property, it retains such character even though community funds may later be employed in making improvements or discharging an indebtedness thereon. McElyea v. McElyea; Laughlin v. Laughlin; Shanafelt v. Holloman; all supra. While the credit of the husband belongs presumptively to the community, still he may contract a separate debt based upon his separate credit and assets acquired in that manner are his separate property. McElyea v. McElyea, supra.

Remaining controverted legal propositions are as follows:

1. There is a presumption that community income is used for community expenses. If more income is used for community expenses than can be attributed to the value of the labor, skill and industry of the husband, then property acquired by him with a balance of income is his separate property.

2. Where the husband employs a manager to operate his separate properties, their entire proceeds are his separate property.

3. The value to the community of the husband's labor, skill and industry should in this case be measured by not more than his income from the Coca-Cola company, or that received by others for like services in that company.

Propositions 1 and 3 may be considered together. The plaintiff is correct in his general contention that when it is established that community funds equal or fall short of community expenditures, property acquired by the husband, having independent funds at his disposal, should be held, by legitimate inference, to be his separate property. This was our holding in Katson v. Katson, supra. In California several cases declare the validity of the inference, which is really rested on the presumption that in absence of an arrangement or agreement to the contrary, community earnings are chargeable with community expenses. Thomasset v. Thomasset, 1953, 122 Cal.App.2d 116, 264 P.2d 626, is illustrative of the point.

The plaintiff's reliance upon this principle in an endeavor to establish in "one fell swoop," as it were, that all of his holdings are his separate property fails, however, for two reasons.

First, his computation of community earnings does not take into account the income from either of his interests in the beer and creamery businesses. According to his income tax records, he received as income 1934 to 1954 a total of $186,554.46. Such sum when added to his cumulative total salary from these concerns during the period from the Coca-Cola business, $84,790, makes a total of $271,344.46, which should be credited to community earnings. Plain-

tiff computes that from 1936 to 1954 the parties spent at least some $196,319.45 for living expenses, which figure includes life insurance premiums. Accepting the accuracy of his computation, for present purposes, it is thus to be seen that community earnings were substantially in excess of community expenses.

The case of Wilson v. Wilson, 1946, 76 Cal.App.2d 119, 172 P.2d 568, dealt with a similar contention. It was there held that a showing community earnings exceeded community expenses, even though the excess be slight, supports a finding of community property.

The excess in the present case, $75,025.01, equals approximately one-fifth of the cost of plaintiff's acquisitions, according to his calculations, the sum of $385,155.50. Certainly an excess of this amount demonstrates the inapplicability of the principle declared.

While the foregoing is sufficient to conclude the point, because some of the matter presented here by the defendant is also relied upon by her as affording support for the trial court's determination of community ownership generally, we notice the matter here and assign it as a second reason for the rejection of plaintiff's present contention. This is that the manner in which the figures of community expenses and income were arrived at by the plaintiff and his accountant, Mr. Mason, was not so reliable

as to demand the trial court's acceptance of them.

This accountant examined cancelled checks drawn on the plaintiff's bank account, checks issued by the creamery and Coca-Cola businesses which the plaintiff said were issued for his family expenses, and plaintiff's bank deposit slips.

Plaintiff's accountant testified he compiled the figures in question a few days before the trial; that the schedules he developed from the records made available to him were not intended to be an audit report; that during these few days he examined about 7,000 checks; that he did not examine all deposit slips; that only some of the deposit slips indicated where the money came from and that he could not give the percentage of the total represented by deposit slips; that he classified some items as living expenses in part upon oral information furnished him by the plaintiff on the basis of plaintiff's memory; that he could not give the percentage of checks which were classified as living expenses where the checks identified the expense as such. He also testified: "I am not in a position to state that any money placed in the bank was used specifically for any specific purpose."

The defendant's accountant, Mr. Heggem, employed for the purpose of this action, was present in the courtroom when Mr. Mason gave his testimony. When questioned regarding the significance to be placed upon Mason's analysis of plaintiff's bank account, he testified:

"Well, I think Mr. Mason will agree with me that any determination of income and expenditures by reference only to bank statements and checks can certainly not be considered accurate. Many funds might be received that never go through the bank. Many expenditures might be made which do not go through the bank account. We have always, in the profession, I think, we have always considered determination of income by analysis of bank statements as the last resort in order to make the best summary we can under the circumstances."

Mr. Heggem further testified he called at Mr. Mason's office during the progress of the latter's examination; that all deposit slips were not there and that some of those there did not indicate the source of funds; that not all of the checks identified the nature of the expenditure. When asked what significance he would place upon a set of schedules as compiled by Mr. Mason if he (Heggem) had prepared them, he testified:

"I would be constrained to tell him (the court) that my summary, if prepared, wasn't absolutely based on fact. That a large part of it would necessarily have been based on assumption."

In view of the matters on which the plaintiff's accountant had to rely in developing his computation, it must necessarily have been the result of considerable guesswork. We cannot say it was error for the trial court to refuse a finding to the effect that the only asset of the community was plaintiff's Coca-Cola salary and to also rule community income was exhausted by community expenditures.

The second contention noted above is that when the plaintiff employed managers to operate his separate properties, their entire proceeds were also separately owned by him. Here the plaintiff directs us to evidence that managers were employed by him to operate every business in which he had any interest except the Coca-Cola company.

■■■ We think it is not subject to dispute that if a husband owning property as his sole and separate estate employs others to manage it and does not himself expend any labor, skill or industry upon it, the proceeds of the property must be held to be his separate property. §§ 57-3-4, 57-3-5, set out supra, and 57-3-3, N.M.S.A., 1953.

In Katson v. Katson, supra [43 N.M. 214, 89 P.2d 526], we said:

"It was contemplated by the statute which provided that the rents, issues and profits from the separate estates of the spouses should be separate property * * * that separate property should have the direction of the owner;

and it could not have been intended that its owner must employ a manager to avoid its loss to the community. * * *

"If the appellant had desired, he could have employed a manager, in which case the entire proceeds from the operation of the cafe would have been his separate property. * * *"

We take it that defendant has no quarrel with the language of the Katson case, but she contends its application is limited in two respects: first, that the rule only applies where it is *found* that the property is separate property; and, second, that when the husband makes active use of the revenues derived from all sources during coverture, the profits are community and separate property in proportion to the amounts attributable to the husband's personal efforts and to capital investment respectively. She would also have us say the value of the "rents, issues and profits" from separate property should be measured by the rental value of the property, relying on the decision in Laughlin v. Laughlin, supra [49 N.M. 20, 155 P.2d 1014].

■■■ The rule, of course, assumes the existence of separate property. Also, when the owner of separate property participates in its operation to an extent that he may be said to be responsible for a portion of the proceeds arising from it, the proceeds shall then be apportioned as separate and com-

munity property. However, the Laughlin case does not set up a rule-of-thumb that once such participation is shown the owner of the separate estate is entitled only to its reasonable rental value upon apportionment. Instead, the method of division to be used depends upon what is best under all the proof. It is only when the actual value of the owner's efforts cannot be arrived at that resort may be had to more arbitrary proof of value, such as proof of the value of like services by others, prevailing rental values or interest rates upon investments. Katson v. Katson, supra.

The matter is of but minor significance in this case, however, in view of our determination already made that plaintiff's interest in the creamery business was not his separate property, and our determination hereafter that none of the remainder of plaintiff's business interests were proved to be separately owned, with the exception of the Coca-Cola company, where the plaintiff admits he expended his labors, and his interest in the Campbell Building Company, declared hereafter to be his separate property. There is no problem of apportionment with respect to the latter interest, for its sole income consists of rentals collected by the father and they belong entirely to the plaintiff as his separate property to the extent of his one-half interest therein. See also discussion of Central Bar, infra, Nos. 4 and 6.

We now direct our attention to the question of the correctness of the trial court's determination that remaining specific properties were held in community ownership.

1. *The family residence.* The original cost of the construction of the residence (during the period from July, 1936 through 1937), including the lot, was $17,398.55. To acquire it the plaintiff cashed a life insurance policy acquired before marriage for which he received $1,234.73. He drew $10,720.90 from the Coca-Cola company, and he borrowed $7,000 from the Clovis National Bank on three promissory notes executed in 1937. The notes were later paid, but plaintiff did not recall what funds were used for this purpose.

Through 1937, plaintiff's total salary from Coca-Cola was $20,765. According to his chart of cumulative totals, his living expenses through that period traceable by his checks amounted to $9,404.57. The plaintiff did not have his own bank account until 1937, but he says his accountant examined the Coca-Cola books and checks to determine how much money was used for his living expenses. While this figure is not entirely free from doubt, it seems that over the seven-year period covered, the family living expenses were in all probability much more than that sum. In fact, if the community expenses had been only $3,681 a year, not only his Coca-Cola salary, but dividends as well, would have been con-

sumed. It was not until 1937 that plaintiff acquired an interest in the beer company partnership, but he did not draw any of his profits out of that business. We think the plaintiff has established that the community had no funds with which to acquire this residence.

Beyond question, the life insurance policy proceeds and the money drawn from the Coca-Cola company were plaintiff's separate property and they must have gone into the purchase.

The evidence is also convincing the bank loan was obtained upon the personal credit of the plaintiff or that of his father, who probably was a co-signer on the notes, because plaintiff's yearly Coca-Cola salaries for 1936 and 1937, $6,000 and $2,375 respectively, hardly seem sufficient to support an unsecured loan of $7,000. The first time any income was reported from the beer company partnership, the only other community asset existing during this period, was in 1938.

■ There being no evidence as to what funds were used to repay the $7,000 indebtedness, the presumption is it was discharged from separate funds, at least where separate funds are shown to exist, Laughlin v. Laughlin, supra; as in this case where the proceeds from Coca-Cola dividends and profits amounted to $57,710.66, according to the summary of tax returns.

The plaintiff testified a furnace and air conditioner were placed in the house in 1947 and that the residence was enlarged in 1951 and 1952. His analysis of bank account disbursements credited to "Residence" after 1937 total $11,273.70. There is no evidence to further identify these expenditures.

■ While the community would have a right to be reimbursed for community funds expended in improving the separate property, the proof on the point is not sufficient to establish any liability. Laughlin v. Laughlin, supra.

We note that plaintiff has assigned as error the refusal of the trial court to rule the furnishings in the residence were his separate property. He has not attempted to trace what items were originally acquired, although he asserts $1,729.16 of his separate funds went into the purchase of furniture in 1937.

■ Even if we accepted his contention he had expended his separate funds to this extent, there would be no way to segregate the articles purchased, for his chart indicates a total of $8,257.39 was expended for furniture during the marriage. There is no proof as to what items were purchased. As funds were increasingly available to the community after 1937, it cannot be said the furniture could only have been purchased with separate monies. The

proof of separate ownership is not sufficient.

The finding of the trial court that the furnishings in the residence belonged to the community is upheld, but its finding that the residence was community property is not supported by substantial evidence.

2. *Hull & 7th Street Properties in Clovis with Service Station.* The plaintiff bought a one-half interest in this property in 1942, at a cost of $6,855.26. Relying upon his contention and the lower court's finding that his interest in the creamery business was his separate property, he asserts this property must have come from $7,777.36 profits paid to him by the creamery. Since we have held the evidence insufficient to support the finding the creamery interest was separately owned, there is no evidence to establish the separate character of the present property, and the trial court's ruling is affirmed.

3. *The Manion or Rock Building in Tucumcari.* This property was acquired at a special master's sale in 1944 for $3,500. Here the plaintiff relies upon his argument the community living expenses at that time had exceeded community income, but his income from the creamery is not taken into consideration and no other proof of the source of the funds for this purchase is offered. The finding of community ownership is affirmed.

4. *The Blue Ribbon, Palace Lounge and Central Bars.*

The Blue Ribbon Bar in Clovis was acquired by the plaintiff on January 1, 1942. All we know about the acquisition of this property is that on said date the Blue Ribbon Bar was indebted to the Clovis Beer Company. The plaintiff took over this business for the beer company simultaneously with the exchange of his interest in the beer company for an equivalent interest in the creamery business. All the plaintiff argues is that the acquisition was an outgrowth of the one-third interest he held in the beer company, which the trial court found was separate property, a finding we have determined is not supported by substantial evidence. The proof is insufficient to establish separate ownership of this property; the trial court's finding of community ownership will not be overturned.

The Central Bar in Tucumcari was acquired by the plaintiff in 1944 at a cost of $11,347. The plaintiff drew a check on the Clovis Beer Company for that amount, which he says he borrowed from his father. In his argument under this point, plaintiff directs us to his testimony that the purchase price was paid back in five months from profits from this bar, but we note an indebtedness for such sum is included in his exhibit calculating amounts due his father on various loans, against which are credited various lump-sum pay-

ments by the plaintiff, which payments fall short of the calculated indebtedness by $62,682.

At the time of trial this bar had been sold and the plaintiff received a note for the balance of the purchase price, $3,219.29. He testified half of the note belonged to his mother as a result of transactions between his mother and B. P. Bozeman (a cousin of the plaintiff who operated the Central Bar). The trial court held plaintiff acquired this bar with separate funds and his interest in the note was his separate property—a determination not challenged by defendant on cross-appeal. The matter is detailed here, because the plaintiff says he used $14,000 of the profits from this business to repay his father for advancements of $26,000 made by the latter for the plaintiff's purchase of the Tejon Grant Ranch, which property the trial court held belonged to the community. Under a further point, plaintiff contends the funds from the profits of the Central Bar traced into that ranch are his separate funds.

The Palace Lounge and building in Tucumcari was acquired in 1949 by plaintiff's purchase of it from B. P. Bozeman. The evidence is somewhat confused as to this acquisition, but apparently the plaintiff had an interest in this property to the extent of $2,804.82, which he acquired either before or after he borrowed $6,500 from his father to buy Bozeman out, for the plaintiff says the total cost of this property was $9,-304.82. The father's check to Bozeman for $6,500 was made an exhibit and bears the notation: "½ intrest 220 E Main". This bar was also operated by Bozeman and returned a profit to plaintiff of $35,248.28. It is now operated only as rental property.

Here we notice another circumstance of some confusion. The trial court found that the community was indebted to plaintiff's father in the sum of $44,084.97. This is the total of amounts listed as being owed to him by plaintiff's answer to defendant's interrogatories, which answers, plaintiff says, were prepared prior to his accountant's examination of the records. Included in these obligations is this item:

"3. Note to G. A. Campbell dated 12/10/49, 6% on demand, prin, sum $6,500."

In the accountant's tabulation of debts owed to the father by the plaintiff, we find, under the heading "Loans deposited to personal account":

"12/8/49—Loan to purchase B. P. Bozeman ½ of Tucumcari Building Check on G. A. Campbell     $6,500."

No other item of the same sum appears on either calculation of indebtedness. We think the assumption is warranted that the community has been charged with the repayment of a note given by plaintiff for the money advanced by his father for the purchase of the Palace Lounge and Building in Tucumcari.

While the plaintiff contends such indebtedness was his separate obligation and not that of the community, we cannot say such fact is proved. The father testified:

"Q. I hand you Plaintiff's Exhibit No. 51, being a check to B. P. Bozeman for sixty-five hundred dollars dated January 3, 1950, and ask you what that is for? A. That is a check that I gave Bozeman for a half interest in the building that Dale has on Main Street.

"Q. Where is that building located? A. It is in Tucumcari.

"Q. I hand you Plaintiff's Exhibit No. 60? A. Yes, sir.

"Q. Being a check to Dale Campbell for twenty-two thousand dollars dated November 9, 1951. What does that check represent, Mr. Campbell? A. I loaned it to him to buy cattle with.

"Q. Have you, from time to time, had occasion to loan Dale Campbell money? A. Oh, every day almost.

"Q. Does he pay you back from time to time? A. Yes, sir.

"Q. How does he pay you back Mr. Campbell? A. Just whatever he happened to get a hold of, if he gets, oh, ten thousand he would give it to me or five or if he didn't get a hold of any he didn't pay.

"Q. Then, you don't credit it on any particular indebtedness, do you? A. No, sir."

The plaintiff testified:

"Q. * * * How do you pay your Father back when you borrow these large sums of money or get these large sums of money from him? What is the procedure? Do you pay back a specific debt or if you owe him seventy-five thousand you pay him a lump sum? A. I just pay him a lump sum, like, for instance, I will get a payment on a note maybe or on these sales, or I will sell some cattle, and I have made several cattle sales, pretty heavy sales, I would just figure up how much I could spare and write him a check for it.

"Q. Most of the time, Dale, do you execute a note for these indebtednesses or what is the procedure between you and your Father? A. No, we have been pretty lax on that. Ordinarily he has got a check and he writes it down or something like that, we don't always execute notes."

Under the procedure followed by the father and son, we think it cannot be concluded there was any understanding between them, tacit or otherwise, that the indebtedness was to be separate. The finding of the trial court that this property was owned as community property is affirmed.

5. *The Campbell Building Company.* In 1940 the plaintiff acquired a one-third interest in this company, its assets being the building and lots occupied by the Coca-Cola company. The lots were first acquired by the plaintiff's mother in 1926 with $2,000 given to her by plaintiff's father. After the Coca-Cola building had been erected, and at a time when the plaintiff and his sister each held a one-third interest in the business, in 1940, they entered into a contract with their parents whereby they agreed to pay $16,376.85, in monthly payments of $200, for an undivided one-third interest each in the property, executing their promissory notes for such sum. (We have already noted the plaintiff acquired an additional one-sixth interest from his sister as his separate property in the portion of this opinion concerning the cross-appeal.)

The defendant, in support of the finding plaintiff's one-third interest is community property, makes some point of the fact the note he executed to his parents was not produced at the trial below and urges there is no proof the note was ever delivered to him with payments credited thereon.

Without passing upon the law generally as to the manner in which a gift of such interest may be effected, it must be said the evidence shows that the parties considered the note to be fully discharged. Furthermore, no indebtedness for such sum or any balance is to be recognized among the sums on which the trial court apparently based its finding of amounts owed by the community to the father.

The father's testimony as to the transaction was:

"Q. Now, throughout these proceedings we have been referring to the Campbell Building Company. Of what is the Campbell Building Company consisted of, Mr. Campbell? A. Well, it consists of the Coca-Cola Building and the lot it is on.

"Q. That is all that there is in it? A. Yes, sir.

"Q. How did Dale and Dona get an interest in that building? A. Well, you got a note there, haven't you, that shows how they paid for it, how they got it, I gave it to them in the long sense of the word.

"Q. What do you mean you gave it to them? A. They never did pay anything for it.

"Q. What do you mean they never did pay anything for it? A. Well, they paid me on the rentals is all.

"Q. What was the reason you made a contract with them in the first place, Mr. Campbell? A. Well, just to let them get into the whole business, they had one-third of the operation, I thought I might as well let them have a third of the building.

"Q. Did you make credits on the note they gave you? A. Yes, sir. They gave me a note and each year I credited the note.

"Q. With a gift of how much? A. Three thousand dollars each.

"Q. What did you do with the rent? A. I credited that, their part of it to the note and I kept the money.

"Q. You kept the money? A. That's right."

To elucidate, the note referred to as being present was apparently the note executed by the sister. Also, the building was, of course, occupied by the Coca-Cola business, which, either through the operating partnership or the corporation paid rent to the Campbell Building Company on a sliding-scale basis dependent upon gross sales. These rentals were retained by the father who credited the plaintiff and his sister with proportionate payments on their notes. In addition, he credited each of them by way of gift with $3,000 a year.

The plaintiff testified:

"Q. Well you recall that you entered into a contract to buy an interest in the Campbell Building Company? A. Yes, sir.

"Q. And you were to get an interest in the rents? A. Yes, sir.

"Q. By virtue of that contract? A. Yes, I have stated that several times.

"Q. You, in turn, were to pay a certain amount of money in return for that interest, according to your written contract? A. No, according to what we had in mind, I wasn't.

"Q. What you had in mind? A. We knew all the time that that is the way the note would be retired.

"Q. But, you went to the trouble of writing out a written contract? A. That's right.

"Q. Which created a legal obligation on your part? A. Yes.

"Q. Knowing full well that you weren't ever going to pay it? A. That's right.

"Q. Well, all right. Now, in fact, did you receive a third of the income from that property as your share? A. No, it was just credited to the note.

*   *   *   *   *   *

"Q. And also the three thousand dollars per year gift? A. Yes, sir."

The plaintiff contends the indebtedness created on the face of the contract was his separate indebtedness. · We think the evidence is clear that it was. Both the plaintiff and his father testified a gift was meant from the very beginning, except with the understanding plaintiff's proportionate share of rentals would be retained by the father and credited on the note. The

purpose of the father's gift was to equalize ownership of the property with ownership of the Coca-Cola company. There is no evidence in contradiction and the fact of gift is completely consistent with the general disposition of the Coca-Cola business by the father. As in the case of In re Faulkner's Estate, supra, we think the only testimony of positive character in the case cannot be ignored.

The defendant again relies upon the parol evidence rule, upon the candid admissions of the plaintiff and his father with respect to other transactions that they had sought to avoid tax liability, upon the absence of a gift tax return to cover the transaction, and finally upon the accountant's letter to the Internal Revenue Service to the effect the sister had acquired her interest in the creamery business by purchase rather than by gift.

The inapplicability of the parol evidence rule has been declared above. There is no testimony or argument that the transaction did result in a tax avoidance, much less a tax evasion. The accountant's letter, while persuasive as to the manner in which plaintiff acquired his interest in the creamery, can hardly be said to constitute proof of the manner of plaintiff's ownership of entirely different property. This leaves only the circumstance that a gift tax return was not produced, which, standing alone and contradicted by the direct evidence noted, we do not deem sufficient to bolster the trial court's holding the one-third interest was community property.

The plaintiff has established separate ownership of this interest and all its proceeds.

6. *The Mize Note, Mineral Reservation and Mining Lease (Tejon Grant and Van Huss Ranches).*

The plaintiff purchased the Tejon Grant, also known as the Don C. Taylor Ranch, in Sandoval County, New Mexico, on March 26, 1945 for $38,400. The source of funds was: $11,598.61 drawn from the Campbell Dairy & Ice Cream Co.; $26,000 borrowed from the father; $2,000 drawn in salary from the Coca-Cola company; some portion of $2,978.32 cash on hand. These sums exceed the cost of the property, but indicate where the purchase payment was derived.

In view of the community character of the funds drawn from the creamery business, and the testimony noted in connection with the plaintiff's acquisition of the Palace Lounge in Tucumcari relevant to the procedure followed by the plaintiff and his father as to loans made by and repaid to the latter, the determination of the trial court that this ranch was community property is unquestionably correct.

According to the plaintiff's evidence $5,000 of the father's loan was repaid by money drawn from plaintiff's interest

in the creamery business in February, 1946, at which time he paid his father $13,000. We think the evidence is sufficient to establish that the remaining $6,000 must have come from plaintiff's profits from the operation of the Central Bar, which property the trial court found was plaintiff's separate property. As the defendant has not challenged this finding on her cross-appeal, and as there was no proof that the plaintiff had any real part in the conduct of this business which could be said to be responsible for its proceeds, or any portion of them, the plaintiff should be credited with the sum of $6,000 separate funds used to discharge a community indebtedness.

We note, incidentally, that the trial court's finding of the community indebtedness to the father, as already noted, was based upon the plaintiff's statement of such debts in response to written interrogatories of the defendant. This item appears there: "Note to G. A. Campbell, dated 5/1/45, prin. sum $26,000, no interest         $5,-000.00". There is no proof of the source of funds used to repay this $26,000 loan except for the payment of the $13,000 in 1946.

The Van Huss Ranch, adjoining the Tejon Grant Ranch, was purchased by the plaintiff on May 8, 1950, for $45,000. The source of this money was: $7,500 borrowed from the Clovis National Bank on plaintiff's personal note; and two sums taken from the Campbell-McDonald Ranch account (plaintiff and his then father-in-law composed the partnership of Campbell-McDonald which operated the Tejon Grant Ranch), for a total of $40,750. A mortgage was executed on the ranch and a note for $22,000 went to the seller.

We think it is established that $4,500 used to pay the bank indebtedness of $7,500 was obtained by plaintiff drawing upon his separate property in the Coca-Cola business. His accountant so testified, and such statement appears on plaintiff's exhibit of the accountant's report. The defendant does not directly contradict this assertion, but merely relies upon testimony already noted as to the manner in which the accountant had to do his work and the statement he made that he was not in a position to say that any specific money placed in the bank account went any specific place. But he does testify that in view of the money plaintiff had on hand, the drawings on the Coca-Cola company must have been for that purpose. The proof is not absolute, of course, but that is not required. Plaintiff should be credited with the payment of such sum. According to plaintiff's accountant the balance of the note was paid with Campbell-McDonald Ranch funds, which under the trial court's finding, here affirmed, was community property.

The mortgage given to the seller of this ranch for $22,000 was fully paid in Novem-

ber, 1951, at which time the plaintiff deposited $65,250 proceeds from the sale of his Coca-Cola interest. His accountant testified:

"Q. Can you tell from this schedule how he retired the notes that are represented under source of funds and also under Bill Van Huss (the seller)? A. Well, the note that was paid for Bill Van Huss was assumed to have been paid from drawings from the Campbell McDonald Ranch together with the proceeds from the Coca Cola stock that was deposited to his account."

There is no evidence that the Campbell-McDonald Ranch produced anything more in profits than the two sums which the plaintiff drew totalling $40,750. His second drawing was for $14,000 drawn in October, 1950. If the total sum of $40,750 belonging to the community is traced into this ranch, and $4,500 is traced from Coca-Cola drawings, the ranch is paid for and in the absence of other proof it cannot be said any portion of the funds from the sale of the Coca-Cola interest were touched.

■ The holding of the trial court that this ranch was community property is affirmed except that plaintiff should be credited with the sum of $4,500 personal funds used to pay a community indebtedness.

The two ranches were sold in 1952 to Chester Mize. At the time of trial a balance of $37,313.79 remained due on his note for the purchase price. The mineral rights on the ranches were reserved and are now leased. The finding of the trial court that these assets are community property is affirmed, subject to the allowance of plaintiff's credit as aforesaid.

7. *The Fields or Quay County Ranch.* The plaintiff acquired this ranch on March 12, 1951 for $143,435.28. To obtain this sum of money he drew upon the following sources:

| | |
|---|---|
| Loan from father ........ | $40,000.00 |
| Coca-Cola Funds ........ | 25,750.00 |
| Campbell-McDonald ...... | 23,577.75 |
| Campbell Dairy .......... | 10,000.00 |
| Bank Loans ............. | 47,500.00 |

The plaintiff asserts that the cash he received upon the sale of the Tejon Grant and Van Huss Ranches, $118,999.50, went into the purchase of this ranch, and that the remainder of the money came from funds received upon the sale of his Coca-Cola interest. These funds, however, were not segregated from other monies; all we know is that the fund did go into the plaintiff's bank account, along with everything else.

■ Under these circumstances the trial court finding of community ownership is, of course, correct. However, as it is nowhere contradicted that the plaintiff did draw on his Coca-Cola interest for the sum $25,750, and as defendant's account-

ant had full access to the records the plaintiff's accountant used, we think the plaintiff did trace separate property to that extent into the purchase, and he should be credited therewith, for $24,545.78, the difference between the cash from the sale of the Tejon Grant and Van Huss Ranches and purchase price of this one. The disposition of the trial court should be modified to this extent.

8. *Rental property at 1320 Mitchell in Clovis.* This property was acquired in 1947 for $6,025. There is no specific evidence it was acquired as separate property. The finding of community ownership should stand.

9. *The Cattle on the Quay County Ranch.* Plaintiff borrowed $22,000 from his father for the purchase of the cattle. The contention is the cattle were worth the amount of the father's advancement and there is nothing to indicate the father was relying on community credit.

According to the record, the indebtedness is still outstanding and is included in the sum the trial court found the community owed the father. We have already noted the father testified he relied upon his son to repay him with "just whatever he happened to get a hold of"; that payments were made under a running account arrangement, the plaintiff drawing upon all sources. This cannot amount to proof plaintiff has incurred a separate obligation upon his separate credit. The

finding of the trial court that the cattle belonged to the community will be upheld.

10. *Life insurance policies, bank deposits, income tax refund, Squirt stock and three automobiles.*

With respect to the shares of Squirt stock, the plaintiff says in his brief:

"The Squirt stock was acquired as a result of appellant's owning a part of the Coca-Cola Co., and since the trial court held the latter to be appellant's separate property, he should have applied the same reasoning to the Squirt Stock. The two are inseparable."

In his statement of facts as to this acquisition it is simply stated: " * * * (e) Squirt stock acquired in 1947 for $300." Reference is then made to three transcript pages, which reflect only that the plaintiff drew on his checking account for the purchase of the stock in the year mentioned. We are directed to no proof of any sort in support of the assertion in the brief.

Plaintiff complains that two savings accounts established in 1954 and 1955 and two automobiles purchased in 1954 came either from money received on the Coca-Cola sale or from the sale of the ranches in Sandoval County. The community having assets not expended, this kind of evidence fails to establish separate ownership.

Plaintiff argues the $10,000 tax refund credit on his 1954 income tax is not com-

munity property because the refund "obviously can relate only to return of capital on the Coca-Cola company or interest on the note, or to the same thing pertaining to the Sandoval County Ranch." A single transcript reference directs us to the following testimony:

"Q. Now, Dale, in listing the other assets in the statement of net worth, has there been any tax credit ascertained since then that you have with the United States Treasury Department? A. Yes, sir, I lost so much money last year that I didn't have to pay any taxes and I had paid an estimate of ten thousand dollars on my 1954 estimate and that was carried over.

"Q. So, you still have that credit? A. Yes, sir. I would have drawn it out but they told me by the time I got it out I would have to be paying again.

"Q. You have just left it there? A. Yes, sir."

The trial court could not possibly have determined from this testimony what was responsible for the overpayment, as the losses are not characterized at all.

■ The trial court's findings as to these items are correct.

The question of the payments made by the plaintiff for the defendant's lower court costs, attorneys' fees and support remains to be considered.

By order of the lower court the plaintiff paid the sum of $750 for defendant's attorneys' fees, and the sum of $4,750 for defendant's support. The trial court adjudged that each party should bear their own costs.

Upon application here by the defendant, the plaintiff was directed to pay to defendant for costs incurred by her below an amount of $3,183.94, which costs include $2,973.34, the sum charged by the firm of accountants employed by her. Plaintiff was also ordered to pay $1,000 to defendant on account of her attorneys' fees pending appeal, and the sum of $750 a month for her support.

■ The trial court did not abuse its discretion when it directed the parties to bear their own costs, and the plaintiff should be credited with the sum of $3,183.94 paid on our order therefor; he should also be credited with the $1,000 paid to defendant for attorneys' fees under our order.

Under our order the plaintiff has been paying the sum of $750 a month to defendant for her support. The trial court made no award of alimony, and the defendant's judgment, affirmed here in substantial part, has been drawing interest since its entry on May 31, 1955. The plaintiff should be credited with the money he has paid for

the defendant's support under our order, and each party should bear one-half of the costs of this appeal.

This opinion is unusually lengthy because of the number of challenges made on the judgment below and their seriousness. The transcript of the proceedings exceeds 1200 pages. The briefs submitted, excluding those on motion, cover more than 300 pages. Counsel for both parties are to be commended for their diligence in the analysis of issues and study of the record. The task of trying to determine where the money which passed through plaintiff's hands during nearly a quarter-century (over one million dollars) came from and for what it was expended has been greatly aided by the care with which the matter was presented both below and here. Despite all this, however, we still must render our opinion only with the conviction that to the best of our ability the issues have been decided upon the record made, under appropriate rules of substantive law and appellate practice—not with the conviction that abstract justice has been accomplished. We may, therefore, be forgiven pointing to the obvious desirability of a practice of segregation of separate and community assets, where such is possible, and the benefits to be derived from the execution of property agreements between the parties arrived at under the patient counsel of their attorneys.

Upon application of the parties the community property shall be equally apportioned between them in the lower court by a method of division best suited under all the circumstances. The parties may stipulate as to the market value of such property, or failing in agreement, introduce evidence of value.

The cause is reversed in part and affirmed in part and is remanded to the District Court for further proceedings and for the entry of a new judgment in accordance herewith.

It is so ordered.

KIKER, J., and C. C. McCULLOH and FRED J. FEDERICI, District Judges, concur.

LUJAN, C. J., and COMPTON, J., not participating.

SADLER, Justice (dissenting).

If the majority correctly uphold the trial court's finding that plaintiff's interest in Coca Cola Company was his separate estate (and in my view they do), it is difficult for me to understand how, in good reason, they can strike down for lack of substantial support in the evidence the finding that his interest in Campbell Dairy and Ice Cream Company is likewise property of the same character, namely, separate estate.

Indeed, to my mind the majority opinion presents an anomaly in this, that some of the same items of evidence, or considerations stressed through lack of it, employed arguendo in support of a finding of separate character as to the Coca-Cola Company interest, seem to be given a contrary significance for purpose of overturning the like finding of separate character to plaintiff's interest in the Campbell Dairy and Ice Cream Company. In each instance it was the same presumption of community character that had to be overcome and, as to each, some of the same items of evidence were available to supply inferences supporting or in derogation of the finding.

In the case of the Coca-Cola Company interest (now represented by plaintiff's interest in the Kerley note) inferences in derogation of the finding were disregarded and deemed inconclusive and the finding is sustained. This was in accord with the prevailing rule applicable on appeal. Marchbanks v. McCullough, 47 N.M. 13, 132 P.2d 426; Sands v. Sands, 48 N.M. 458, 152 P.2d 399; Brown v. Cobb, 53 N.M. 169, 204 P.2d 264. An application of the same rule to the finding challenged as defendant's second point on the cross-appeal, to wit, the finding of separate character to plaintiff's interest in Campbell Dairy and Ice Cream Company, dictates a like ruling sustaining this finding.

Both the father and son testified positively to a gift from the father to the son of the latter's interest in Clovis Beer Company which he exchanged for his interest in the Dairy and Ice Cream Company. Some of the same facts and considerations, cited in the majority opinion in sustaining the finding as to the Coca-Cola interest apply with equal aptness to support for the trial court's undoubted holding of a gift by the father to plaintiff of his interest in Clovis Beer Company.

The conclusion announced arose in my mind on a first study of the prevailing opinion after giving an unusual amount of time to consideration of the massive record and extensive briefs filed. It grew progressively stronger throughout my work on the case and still abides. It compels me to disagree with the opinion submitted for the reason stated above.

The majority ruling otherwise, I dissent.