636 P.2d 878

**Manuel PORTILLO, Petitioner,**

v.

**Ida SHAPPIE and Rene Shappie,
Respondents.**

No. 13145.

Supreme Court of New Mexico.

Nov. 19, 1981.

White, Koch, Kelly & McCarthy, Larry White, Santa Fe, for petitioner.

Solomon, Roth & VanAmberg, Ronald J. VanAmberg, Santa Fe, for respondent.

## OPINION

PAYNE, Justice.

The plaintiff-appellant, Manuel Portillo, brought suit in district court to have an equitable lien imposed against real estate whose current titleholders are the defendants-appellees, Ida and Rene Shappie. The plaintiff based his claim on his community property interest in the realty which had previously been the separate property of his deceased wife, Frances Montano. The trial court entered judgment for plaintiff, imposing an equitable lien in the amount of $2,800. The plaintiff appealed to the Court of Appeals. Two judges agreed on the measure of recovery but disagreed on the actual amount proved at trial. We granted certiorari to determine the proper measure of recovery.

When the plaintiff married Frances Montano in 1950, Montano owned the realty in question as her separate property. The only improvement on the property at that time was a 400-square-foot, two-room adobe structure. During their 26 years of marriage, the couple resided continuously on the property. The plaintiff invested community funds and his own labor to add substantial improvements to the property, doubling the size of the original structure

and building a detached apartment. A year before her death, Montano executed a warranty deed granting the property to her daughter, Ida Shappie. Ida and her daughter, Rene Shappie, now hold the property as cotenants.

The trial court found, based on uncontradicted testimony of a professional real estate appraiser, that on the date of Montano's death in 1976 the value of the real property, unimproved by community funds and labor, was $8,500, and that on the same date the value of the property as improved by community funds and labor was $33,400. The court also found that, although plaintiff kept no records of expenses or hours of labor invested in making the improvements, their reasonable value was $2,800. The court awarded plaintiff a lien limited to that amount.

We decide what is the proper measure of the community's recovery when the community has invested its labor and funds in improving the separate realty of one of the spouses. Defendants argue that the district court's award was the proper measure, while plaintiff argues that the community is entitled to the enhanced property value directly attributable to the community investment. We hold that the community is not limited to a lien in the amount of its funds and labor expended in making the improvements.

## I.

Defendants rely on several New Mexico cases in arguing that the plaintiff's lien is limited to the amount of funds and labor the community expended in making the improvements to the property. However, none of these cases decided the precise issue presented here.

In *Laughlin v. Laughlin*, 49 N.M. 20, 155 P.2d 1010 (1944), this Court considered the status of the proceeds of farming operations conducted by the husband on land that was the wife's separate property. We held that the rule of apportionment, "that accumulations resulting from a combination of the use of separate property of a spouse with the labor, skill and industry of one or both of the members of the community should be equitably divided between the two," *id.* at 27, 155 P.2d at 1014, as established by the Court in *Katson v. Katson*, 43 N.M. 214, 89 P.2d 524 (1939), applies to rents, issues and profits derived from the operation and management of realty as well as of personalty. The *Laughlin* court did state that "[t]he burden was upon appellant to establish the amount of community funds that were used in paying the mortgage debts and in making improvements on the appellee's farm before a lien (if he is entitled to a lien to secure his reimbursement) could be impressed." *Laughlin, supra,* at 36, 155 P.2d at 1020. However, the Court noted that the amount of community interest in the proceeds of the sale of the crops was not presented for review. Therefore, any language regarding the amount of a community lien based on improvements to realty was unnecessary to the decision.

The Court's treatment of the value of the community lien in *McElyea v. McElyea*, 49 N.M. 322, 163 P.2d 635 (1945) was likewise unnecessary. There, the issue before the Court was the status of the title to separate realty on which the community had made improvements and mortgage payments. The Court held that the property remained separate, stating:

> It is not claimed that the community is entitled to a lien for funds advanced in payment of these mortgage debts, but it is asserted that appellant is *an owner of an interest in the land * * *.* If any part [of the mortgage debt] was subsequently paid by the community, or if the land was subsequently improved with community funds, then appellee became indebted to the community in the amount so expended. But the community did not by reason thereof, become part owner of the property. It belonged to appellee from the time it was purchased. *Laughlin v. Laughlin,* supra.

*Id.* at 325–26, 163 P.2d at 637. The statement regarding the amount of the debt to the community is dictum, as that question was not presented.

The only question in *Campbell v. Campbell*, 62 N.M. 330, 310 P.2d 266 (1957), was whether substantial evidence supported the trial court's finding that the family residence was community rather than separate property. In holding that the residence was not community property, the Court gratuitously cited to the dictum from *Laughlin, supra,* stating that "[w]hile the community would have a right to be reimbursed for community funds expended in improving the separate property, the proof on the point is not sufficient to establish any liability." *Campbell, supra,* at 362, 310 P.2d at 287.

The amount of the community lien against a spouse's separate property was at issue for the first time in *Galloway v. White*, 64 N.M. 470, 330 P.2d 553 (1958). However, the question was not whether the community claim was limited to the amount of funds and labor expended, but merely whether there was substantial evidence to support the trial court's finding that the community was entitled to a lien based on a $7,170 expenditure for improvements to the separate realty. The Court cited the *Laughlin* dictum that "[i]t is incumbent on the spouse claiming a lien on the other's separate property for improvements placed thereon by community funds to establish the amount of such funds." *Id.* at 472, 330 P.2d at 554. The Court noted that the claimant had introduced evidence on both the cost of the improvements and the increased value of the realty resulting from those improvements, but did not deal with the trial court's handling of the evidence on increased value. The Court merely held that the trial court's finding was based on substantial evidence.

The Supreme Court also considered whether substantial evidence supported the trial court's finding of a community lien against a spouse's separate property in *Michelson v. Michelson*, 89 N.M. 282, 551 P.2d 638 (1976). The trial court had awarded the wife a lien against the family residence, which was the husband's separate property, in the amount of $8,110, based on its findings that

[t]he only separate funds of defendant [husband] used in the home was [*sic*] the $14,000 paid for the lot upon which the home is constructed. The value of the home exceeds the original land price and the mortgage balance by $32,440.00. Fifty (50%) percent of this value is attributable to the community expenditures of time, effort and money and the other fifty (50%) percent is attributable to the normal appreciation of property. The community has a lien against the home in the amount of $16,220.00.

*Id.* at 288, 551 P.2d at 644. The Supreme Court upheld the trial court's finding as to the wife's lien, noting that the source of the $35,500 spent on improvements was not proved to be either community or separate funds, that the community had made several mortgage payments and pledged its credit to refinance the mortgage, and that "[t]he parties expended considerable time and effort in making improvements." The Court, however, made no ruling on the propriety of the amount of the lien because "[t]he parties agreed that if a community lien was found to exist against the home, the wife's interest would be $8,110." *Id.* Although the Supreme Court cited *Laughlin, supra,* and *McElyea, supra,* it did so only to support its finding of substantial evidence of community expenditure allowing the imposition of a lien.

Our examination of the relevant New Mexico cases indicates that the issue of the measure of a community lien under the circumstances presented in the instant case has never been decided. References to the amount of such a lien have been dicta. Accordingly, we must look to general principles of community property law for guidance.

## II.

Separate property consists of all property brought to the marriage by either spouse or acquired during marriage by gift, bequest, devise or descent, together with its rents, issues and profits. Community property consists of all property "acquired by either or both spouses during marriage, which is not separate property," and its

rents, issues and profits. § 40–3–8, N.M. S.A. 1978. Those definitions have been in effect since 1907. *See* R. Clark, Community of Property and the Family in New Mexico 13–14 (1956) [hereinafter cited as R. Clark, Community of Property]; Bingaman, *The Community Property Act of 1973: A Commentary and Quasi-Legislative History,* 5 N.M.L. Rev. 1, 3–9 (1974).

 The courts of New Mexico have long struggled with the meaning of "rents, issues and profits" of property in the context of community investments of funds and labor in the separate income-producing property of one of the spouses. The Supreme Court first established the rule of apportionment of income or increase in value in *Katson v. Katson, supra,* when it recognized that the community owns the earning power of each of the spouses, and that when that earning power is used for the benefit of one's separate property "the portion of the earnings attributable to his personal activities and talent is community property." *Id.* at 217, 89 P.2d at 526 (citation omitted). We have dealt with apportionment of income in a variety of situations, some of which involved difficult fact patterns. *See Corley v. Corley,* 92 N.M. 716, 594 P.2d 1172 (1979); *Hayner v. Hayner,* 91 N.M. 140, 571 P.2d 407 (1977); *Michelson v. Michelson, supra; Gillespie v. Gillespie,* 84 N.M. 618, 506 P.2d 775 (1973); *Moore v. Moore,* 71 N.M. 495, 379 P.2d 784 (1963); *Conley v. Quinn,* 66 N.M. 242, 346 P.2d 1030 (1959); *Galloway v. White, supra; Campbell, supra; McElyea, supra; Laughlin, supra.* We have never adopted one single method of apportionment of income, although many are possible. *See* King, *The Challenge of Apportionment,* 37 Wash.L. Rev. 483 (1962). Instead we have used a "substantial justice" standard. In *Laughlin, supra,* we stated that "[e]ach case will depend upon its own facts * * *. Mathematical exactness is not expected or required, but substantial justice can be accomplished by the exercise of reason and judgment in all such cases." *Id.* at 35, 155 P.2d at 1019. The basic rule we have applied, and will continue to apply, is that "[t]he increase in value of separate property

produced by natural causes or essentially as a characteristic of the capital investment is separate property." *Campbell v. Campbell, supra,* at 357, 310 P.2d at 284 (citation omitted). Beyond that, we have looked at many other factors, including community payment of mortgages, net profits, reinvestment in improvements, amount of income withdrawn by parties for personal use, and rates of interest on capital investment. *See Hayner v. Hayner, supra.*

We have repeatedly stated, however, that the proper apportionment in any one case depends on the facts presented to the trial court. With this in mind, we return to the issue of apportionment, if any, of appreciation of separate property resulting from investment of community funds and labor.

### III.

Although our community property scheme is statutory, it "was modeled after the civil law of Spain and Mexico and those laws will be looked to for definitions and interpretations." *McDonald v. Senn,* 53 N.M. 198, 201, 204 P.2d 990, 991 (1949) (citations omitted). Under the civil law, any intrinsic increase in value of the separate property of a spouse during marriage was separate. But any improvement to or appreciation of that property which resulted from use of community labor or funds went to the community, as did all the fruits and income of the separate property accruing during the marriage. The separate property owner retained ownership of any improvements, but

> the value of the improvements were shared, in the sense that the other spouse owned a half interest in the value of such improvements, or was entitled to reimbursement to the extent thereof. The valuation of the expenses or improvements, it has been said, was to be made on the basis of the time at which the expense was incurred or the improvement made, and not on the greater value of the property resulting from the expenditure or improvement. [Footnotes omitted.]

1 W. DeFuniak, Principles of Community Property § 73, at 188 (1943). Apparently, there was a distinction made in valuation of the community's interest between "improvements that related to sowing or planting on separate land of a spouse and improvements that related to the erection of buildings on the land," *id.*, since

> "the improvements made of plantation, building, etc., are divided, with the difference that if the planting should be done in the particular land of either of the spouses, it shall be divided, deducting first the value of the land before it was planted, and giving or allowing that to the owner; but if a house has been built, or an oven or a mill has been erected on the land of one of them, the person on whose land the building or erection is made, shall have the benefit of it, and shall pay to the other the moiety [half] of what the building cost." Asso and Manuel, Institutes of the Civil Law of Spain, Book I, Title VII, Cap. 5, § 2.

*Id.* at 188–89 n.66.

While the community property law of New Mexico conforms for the most part with that of Spain and Mexico, it differs in one major respect: The rents, issues and profits of separate property belong to the separate property owner and not, as was true under the civil law, to the community. This classification of such rents, issues and profits as separate property, termed by some as the "American rule," W. Reppy & W. DeFuniak, Community Property in the United States 248 (1975), derived from the influx into the Southwest of lawyers trained in the common law. *See* Bartke, *Yours, Mine and Ours—Separate Title and Community Funds*, 21 Baylor L. Rev. 137, 139–41 (1969). The American rule was the progeny of the Married Women's Property Acts, which derived from "the commendable desire to allow married women in the common law states to own and control their own property.... However, under the community property system a married woman always owned her separate property." Clark, *New Mexico Community Property Law: The Senate Interim Committee Report*, in Comparative Studies in Community Property Law 81, 96 (J. Charmatz & H. Daggett eds. 1955) [hereinafter cited as Clark, *Senate Committee Report*]. Thus, the American rule corrected no injustices in the community property system, and instead "probably engendered the greatest confusion and inequities to be found in the system." *Id.* at 97. *See Laughlin v. Laughlin, supra,* at 26–27, 155 P.2d at 1014; *see also* R. Clark, Community of Property, *supra,* at 13 n.50. The decisions of the New Mexico Supreme Court regarding apportionment of income and profits from separate property have done much to correct these inequities and return us to the Spanish emphasis on community of property and of use rather than ownership of separate property. *See* Clark, *Senate Committee Report, supra,* at 96–97.

As noted previously, the Spanish rule apparently was that when community funds and labor produced structural improvements to separate realty that increased the value of that realty, the community was entitled to be paid what the building cost rather than the increased value resulting from the improvements. The basic philosophy behind Spanish community property law, however, was the view of the family as an economic partnership. *See generally* L. Robbins, Community Property Laws With Translations of the Commentaries thereon of Matienzo, Azevedo & Gutierrez (1940). Another goal of the Spanish law was protection of the family property, and "[t]he Spanish law's recognition of separate property seems to have been mainly for the purpose of returning such property to the family line of the particular spouse.... There were express limitations on the testamentary right of a spouse to dispose of separate property beyond the spouse's immediate family." Clark, *Senate Committee Report, supra,* at 97 (quoting Clark, *Matrimonial Law in New Mexico and the Western United States*, in 2 Matrimonial Property 89 (1955)). Although New Mexico law still furthers the concept of the family as an economic partnership, we do not so vigorously protect the property of the family and restrict testamentary power. *See* § 45–3–

101, N.M.S.A.1978. Thus, since our emphasis is different from that of Spanish law, we do not feel bound to adhere to the Spanish rule on improvements to realty, which furthered the limitation on succession. Instead, we will adhere to our long-standing rule of doing substantial justice, based on the facts of each case.

## IV.

In the case at bar, uncontroverted evidence established that plaintiff Portillo, using community funds and his own labor, which was community property, *Katson v. Katson, supra*, added substantial improvements to the realty which was the separate property of his wife. Testimony of the real estate appraiser established that the value of the realty, unimproved by community funds and labor, was $8,500 on the date of Montano's death. That testimony also established that the value of the property as improved by the community funds and labor was $33,400 on the date of her death. It is clear from this evidence that the difference in the two figures, $24,900, represents increase in value of the realty directly attributable to community funds and labor. It represents the rents, issues and profits of community property, and to deny the community the right to a lien for that amount would do substantial injustice under the facts of this case. Awarding plaintiff a mere $2,800, rather than his share of the full community interest of $24,900, would not reflect the real value of the community investment, and would give the separate property owners far more than the value of their naturally increased property ($8,500). As one commentator has noted,

> tying the recovery in every case to the amount of money spent may produce results which, depending on extraneous circumstances, would be unfair either to the separate estate, or to the community, depending on whether the property increased or decreased in value. If the court would treat such expenditures as an equity investment of community funds, rather than a loan, the community would share in the fluctuations of the market, taking both the gains and the losses. In

view of the inflationary forces at work in the economy at present, tying the recovery to the amount of expenditure in each case seems grossly unfair to the community.

Bartke, 21 Baylor L.Rev. at 161. This recovery is also logical and consistent with our rule of apportioning income from separate property.

We therefore reverse the Court of Appeals and the district court decisions awarding plaintiff a lien in the amount of $2,800, and remand with the instruction to enter a decree awarding him a lien in the amount of his share of the community interest of $24,900.

IT IS SO ORDERED.

EASLEY, C. J., SOSA, Senior Justice, and FEDERICI and RIORDAN, JJ., concur.