## No. A-CV-21-85

# Supreme Court of the Navajo Nation

**In the Matter of the Estate of: Mae D. Benally**
**Wilson Benally, et. al.,** *Appellants,*
*vs.*
**Raymond Denetclaw,** *Appellee.*
Decided July 31, 1987

## OPINION

*Before Tso, Chief Justice, Bluehouse and Austin, Associate Justices.*

*Herman Light, Esq., Shiprock, New Mexico for the Appellants; Loretta Morris, Esq., DNA-People's Legal Services, Inc., Crownpoint, New Mexico for the Appellee.*

*Opinion delivered by Bluehouse, Associate Justice.*

Wilson H. Benally has appealed the Crownpoint District Court's distribution of the estate of his wife, Mae D. Benally. Ms. Benally, a member of the Navajo Tribe, died on January 31, 1981. Her last place of residence was Naschitti, New Mexico, which is within the exterior boundaries of the Navajo Nation. She left behind a son from a previous marriage and a son and four daughters from her most recent marriage. The husband is Wilson Benally, who is the appellant in this case. The son from a previous marriage is Raymond Denetclaw, who is the appellee.

The following property is at issue on appeal:

1. Grazing Permit No. 14-1476 for 70 sheep units issued on June 17, 1976 to Mae D. Benally and Wilson Benally. Mae D. Benally had inherited 11 sheep units, included in this permit, from her father in 1976. *In the Matter of the Estate of Clarence Denetclaw,* No. WR-C-PB-486-75, Final Probate Decree (Window Rock D. Ct., February 19, 1976).

2. A land use permit issued to "May D. Benally" and approved July 9, 1953, for 9.5 acres of agricultural land, described as plot A-93. The second page of the permit designates "Raymond, Harry, Virginia Benally" as

beneficiaries upon Mae D. Benally's death. Land Use Permit, p. 2. This page is dated February 16, 1953. "Raymond Benally" is Raymond Denetclaw. Harry Benally is the son of Mae and Wilson Benally. Virginia Benally is the eldest daughter of Mae and Wilson Benally. She is now Virginia Winters.

3. One of six strings of coral beads removed from Ms. Benally's set of jewelry after her death.

On November 30, 1983, the Crownpoint District Court appointed Raymond Denetclaw as administrator of the estate. The district court received Mr. Denetclaw's final report on April 18, 1984. This report stated that the property "passes to the heirs," i.e., the surviving husband and six children, but did not suggest how the property was to be distributed. Final Report at 4.

On August 3, 1984, Raymond Denetclaw submitted an "Administrator's Argument concerning Distribution of the Estate," in which he stated that 11 sheep units from Grazing Permit No. 14-14-76 were Mae D. Benally's separate property, and that the rest of the estate was the community property of Mae and Wilson Benally. Administrator's Argument at 1. Mr. Denetclaw requested the 11 sheep units for himself, arguing that "In Navajo custom, the oldest child usually have more rights than the younger siblings." Administrator's Argument at 2, 3. He also argued that Land Use Permit No. A-93 should be divided between the three beneficiaries designated by Mae D. Benally on page 2 of the permit. Finally, he alleged that the coral beads intended for Mae D. Benally's children were improperly in the possession of Ruth Johnson, Mae D. Benally's sister.

On May 14, 1985, Wilson Benally submitted an "Answer and Counter-Proposal to Distribution Stipulation." He conceded that the 11 sheep units inherited by Mae D. Benally should be awarded to Raymond Denetclaw, but argued that he himself should receive the other 59 sheep units. He also argued that the land governed by the land use permit for plot A-93 was "relatively used by the responding parties," and that he should be named "permanent administrator" for all the heirs. Answer at 1. Wilson Benally's answer did not suggest how the beads should be distributed.

The Crownpoint District Court held a hearing on July 18, 1985, and issued a decree distributing the estate on August 7, 1985. The court noted that Harry Benally was not present at the hearing, and found: (1) that Mae D. Benally's heirs were her husband and six children; and (2) that Raymond Denetclaw was entitled to one string of beads, which had improperly been given to Ruth Johnson. Acting "in accordance with Wilson Benally's oral stipulation in court," Probate Decree at 2, the court awarded 10 sheep units each to Wilson Benally and his four daughters, 11 sheep units to Raymond Denetclaw, and 9 sheep units to Harry Benally. The court further ordered Harry Benally's 9 sheep units combined with Raymond Denetclaw's 11, and a grazing permit of 20 sheep units issued to Raymond Denetclaw. The court

divided the land use permit for plot A-93 between Raymond Denetclaw, Harry Benally, and Virginia Winters, as proposed by Raymond Denetclaw. Finally, the court ordered one string of coral beads returned to Raymond Denetclaw. Wilson Benally submitted a motion for reconsideration on September 6, 1985, which the district court denied on September 13, 1985. Mr. Benally filed a timely notice of appeal on September 6, 1985.

This Court has determined that probable cause exists to grant the appeal. In his Brief on Appeal, Mr. Benally requested a trial *de novo*. However, trial *de novo* has been eliminated by the Judicial Reform Act of 1985; this act limits appellate review to issues of law. 7 N.T.C. §803 (Supp. 1986). For the same reason, this Court may not consider evidence, not introduced at trial in the district court, to which Mr. Benally refers in his brief. This case involves the proper application of Navajo Probate Rules.

## I. Division of Estates Under the Navajo Tribal Code

### A. NAVAJO COMMON LAW

Navajo law governing inheritance requires that:

In the determination of heirs the court shall apply the custom of the Tribe as to inheritance if such custom is proved. Otherwise, the court shall apply state law in deciding what relatives of the decedent are entitled to be his heirs.

8 N.T.C. §2(b) (1977). In *In the Matter of the Estate of Annie Belone*, 5 Nav. R. 161 (1987), this Court set forth the procedure for applying Navajo custom in legal proceedings. In the pleadings, "[w]here a claim relies on Navajo custom, the custom must be alleged, and the pleading must state generally how that custom supports the claim." *Id.* at 164. At trial, a party can prove custom through previous case law, learned treatises, or expert testimony. *Id.* at 165. The court may also judicially notice a custom. *Id.* at 165. In the latter case, the court "must clearly set forth in its order the custom on which it is relying...." *Id.* at 165, 166.

In his pleadings, Wilson Benally did not allege any Navajo custom to support his proposed stipulation. Raymond Denetclaw alleged only that "[i]n the Navajo custom, the oldest child usually have more rights than the younger siblings." "Administrator's Argument," dated August 3, 1984, at 3. Mr. Denetclaw did not argue how this "custom" supported his requested division of property. The district court's order does not mention Navajo custom. The record does not support a division of the estate according to Navajo common law. Therefore, the division must follow state law as applied in Navajo case law and the Navajo Rules of Probate Procedure.[1]

1. In *Sells v. Sells*, 5 Nav. R. 104 (1986), we determined that courts must apply Navajo case law whenever possible, relying on state law to resolve only questions of first impression. *Id.* at 107, 108.

## B. STATE LAW UNDER THE RULES OF PROBATE PROCEDURE

Whenever a decedent is survived by a spouse, the court probating the estate must first determine what part of the estate is community property, and what part was the decedent's separate property. In doing so, the court must apply the laws of the state in which the decedent resided, interpreted in light of the Navajo Rules of Probate Procedure and Navajo case law. 8 N.T.C. §2(b) (1977).[2]

9 N.T.C. §205 (1977) states that:

All property acquired by either husband or wife during the marriage, except that which is acquired by gift, devise or descent, or earned by the wife and her minor children while she lives separate and apart from her husband, is the community property of the husband and wife.

*See also* Rule 5, NRPP. Property acquired during the marriage is presumed to be community property unless shown to be separate. *Mitchell v. Mitchell*, 104 N.M. 205, 719 P.2d 432, 439 (1986), *cert. denied*, 104 N.M. 205, 719 P.2d 60 (1986). Inherited property is separate, even if acquired during the marriage. *Willie v. Willie*, 4 Nav. R. 31, 32 (1983); *Portillo v. Shappie*, 97 N.M. 59, 636 P.2d 878, 880 (1981). Separate property comingled with community property is still separate if it can be clearly traced and identified. *Mitchell*, 719 P.2d at 439.

On the death of a spouse, one-half of the community property belongs to the surviving spouse, and cannot be willed away. Rule 5, NRPP. In New Mexico, if the decedent did not leave a will, the decedent's half of the community property also goes to the surviving spouse. Rule 6(3)(c), NRPP. One-fourth of the decedent's separate property goes to the surviving spouse, and the remaining three-fourths goes to the decedent's children. *Id..*

## C. THE GRAZING PERMIT

Of the 70 sheep units in Grazing Permit No. 14-14-76, Raymond Denetclaw introduced evidence showing that Mae D. Benally had inherited 11 sheep units, which were thus her separate property. One-fourth of these, or three sheep units, belong to Wilson Benally. Adding the 59 sheep units that are community property, a total of 62 sheep units must go to Mr. Benally. The remaining eight must be divided among the remaining six heirs. Thus, each of Ms. Benally's children is entitled to 1⅓ sheep units. However, in Grazing District No. 7, grazing permits may not be subdivided into parts of less than ten sheep units. 3 N.T.C. §785(3) (1977). The *Navajo Reservation Grazing Handbook*, issued by the Resources Committee of the Navajo Tribal Council to regulate the district grazing committee's issuance of grazing per-

2. This assumes that no federal law or Navajo statute applies. 7 N.T.C. §204 (Supp. 1986). If Navajo case law interprets a state law, that interpretation becomes Navajo common law, and as such, it takes precedence over state case law, or even over later changes in state statutes. *Id.*

mits, contains a similar provision. *Navajo Reservation Grazing Handbook* at 24. Thus, according to the Grazing Handbook, the eight sheep units cannot be distributed strictly according to the Rules of Probate Procedure. An award of 1⅓ sheep units is clearly incompatible with Navajo law governing the grazing permit system. See *Navajo Reservation Grazing Handbook* (1957). A distribution consistent with the Navajo grazing permit system must be considered.

In accordance with Wilson Benally's stipulation, the district court ordered a roughly equal division of the grazing permit among all seven heirs. It is clear that Mr. Benally may make a gift of any part of the estate to which he is entitled. However, such a stipulation as Mr. Benally's could have been made for many reasons, including duress and his counsel's ignorance of Mr. Benally's legal rights. Before the distribution in the stipulation is considered as a gift, Mr. Benally must have been aware of his legal right to 62 sheep units. The record does not show that Mr. Benally knew he was entitled to 62 sheep units. Therefore, the stipulation is unenforceable, and it is inconsistent with Navajo probate law.

## D. THE LAND USE PERMIT

The first page of the land use permit for plot A-93 is stamped as having been approved on July 9, 1953. The second page, containing the assignment upon Mae D. Benally's death to three of her children, is dated February 16, 1953. Because two of these three children are also children of Wilson Benally, this court must assume, absent contrary evidence, that Mae and Wilson Benally were married when the land use permit was approved, and that the permit was therefore acquired during the marriage. Thus, unless the permit can be identified as the separate property of Mae D. Benally, the presumption according to law is that it is community property. *Mitchell v. Mitchell, supra,* 719 P.2d at 439. The status of the land use permit requires additional findings of fact.

Under New Mexico law, if a decedent leaves a will that fails to provide for one or more of his children, whether born before or after the will was executed, the omitted child receives a share in the estate equal in value to that which he would have received under the intestate succession law. N.M. Stat. Ann. §45-2-302 (1978).[3] The provisions of this section can be defeated in

---

3. §45-2-302 is titled "Pretermitted children," and provides in part:
   A. If a testator fails to name or provide in his will for any of his children born or adopted before or after the execution of his will, the omitted child or his issue receives a share in the estate in value to that which he would have received if the testator had died intestate unless.
   1. it appears from the will that the omission was intentional;
   2. when the will was executed, the testator had one or more children and devised substantially all his estate to the other parent of the omitted child; or
   3. the testator provided for the child by transfer outside the will and the intent that the transfer be in lieu of a testamentary provision is shown by statements of the testator or from the amount of the transfer or other evidence.

several ways; none of which has been alleged in this case. *Id.* It is not clear from the record whether Ms. Benally's listing of beneficiaries to the land use permit is testamentary in nature. If the land use permit is testamentary, then Ms. Benally may will one-half of the land use permit as her share of community property; or the entire land use permit if it is her separate property. However, the court must be careful to see that pretermitted heirs are protected.

The district court must also determine whether Ms. Benally's listing of beneficiaries to the land use permit is like an assignment of beneficiaries in an insurance policy. If that is the case, the portion of the permit that is not community property may be divided among the beneficiaries listed.

## II. Land and Grazing Permits in Navajo Law

Land use and grazing permits within the Navajo Nation are not "owned" in the same sense that property can be owned in fee simple under the Anglo-American legal system. Although land use and grazing permits are sold or passed through inheritance, all transfers are subject to regulation by district land boards and grazing committees. *See, e.g.*, 3 N.T.C. §237(1) (supp. 1986); 3 N.T.C. §§708(a), 784 (1977). In allotting permits, these committees must consider, among other things, the policies of insuring (1) that tracts assigned by land use and grazing permits are large enough to be economically viable, and (2) that land is put to its most beneficial use. *See* 3 N.T.C. §§233 (2), 237(2), 237(6) (Supp. 1986); 3 N.T.C. §§217(a), 703(3) (1977). *See also, In the Matter of the Estate of Charley Nez Wauneka, Sr.,* 5 Nav. R. 79 (1986). Further, under Navajo common law, a person can only maintain a "right" to productive land if he is personally involved in its beneficial use. *See Wauneka, Id.* at 83, 84.

Title 3 of the Navajo Tribal Code gives courts discretion in the division of estates, so that tracts of land are kept intact and so that the most beneficial use of the land is encouraged. Tribal courts have authority to order that land use permits be transferred to the decedent's "most logical heir." 3 N.T.C. §785(1) (1977).[4] This Court has held that Navajo land policy, which opposes dividing the land into ever smaller parcels, precludes the literal application of intestate succession laws under some circumstances. *Wauneka, Id.* at 83. Courts probating land use and grazing permits must avoid splitting up the permits wherever possible, so long as the rights of all the heirs are protected. *Id.* at 83.

Within Navajo common law, the primary means of achieving this goal of Navajo land policy has been the customary trust. *Id.* at 82. Land placed in

---

4. 25 C.F.R. (1987) does not specifically regulate intestate succession for grazing and land use permits.

a customary trust is held for the benefit of the family unit. _Id._ Courts must appoint as trustees those who are in the best position to encourage beneficial use of the land. _Id._ at 82, 84. All individuals involved in the trust have an interest in the land, and have the right to use it as long as their use is not contrary to the interests of another member of the trust. However, those who make their living from the land should have day-to-day responsibility for its management. _Id._ at 83.

The most important limitation on a court's use of the customary trust in probating an estate is that the members of the trust must be able to cooperate if the trust is to be viable. _Id._ at 82. In _Wauneka_, for example, we determined that the heirs would be unable to cooperate harmoniously in managing a customary trust. _Id._ However, one heir had worked the land for most of his life, and depended on the land for his livelihood, whereas the other heirs had not involved themselves in farming, and intended to sell their interests in the land. _Id._ at 83. Thus, a court may include in a customary trust only those who the court determines will be able to cooperate in the trust's management. Other heirs must be compensated from the estate in the approximate value of their share in the trust property.

The customary trust is so called because, in Navajo custom, land is held and managed for the benefit of the clan and the family. The aim of a customary trust is to keep tracts of land and grazing permits intact and in the family. Therefore, land and grazing permits held in customary trust should descend in somewhat the same way as property held in joint tenancy with right of survivorship. That is, once a customary trust is established, those involved in the trust cannot normally devise their interests in the land or grazing permits to their heirs, as that would cause the rights to be split up among more and more owners. Rather, the permits remain intact, and the last surviving member of the original trust will end up owning the entire permit. However, common-law requirements governing the creation and destruction of joint tenancies do not apply to the customary trust, which is a product of Navajo common law.

Regardless of whether the customary trust or another means of distribution is used, a court probating land use and grazing permits held and used by a family unit must consider the pattern of land use and the relationships within the family in dividing the estate. If the court establishes a customary trust, it must consider these factors in deciding whom to include in the trust and whom to compensate with other property. Interests in productive land cannot simply be divided up according to the intestate statutes, as with other assets.

# III. Instructions on Remand

## A. THE LAND USE AND GRAZING PERMITS

The proper distribution of Ms. Benally's estate depends in part on questions of fact not resolved in the record, and we must therefore partially reverse the district court and remand for a new hearing. The laws of intestate succession entitle each of Ms. Benally's children to an interest equal to 1⅓ sheep units of the grazing permits. Each of the children is entitled to an interest equal to ⅙ or ₁₂ of the land use permit, depending upon whether the land use permit is found to be community or separate property. Wilson Benally is entitled to the remainder of the permits. However, the court must keep these permits intact to the extent possible.

Because all of the heirs have interests in both permits, the court must determine which of the heirs are presently using the land, and which of them can cooperate in managing the land and utilizing the grazing permit. The court may then consider these options: (1) a customary trust with right of survivorship under the laws of the state where the property is located; (3) a tenancy in common, with restrictions on transfer of interests to non-family-members and provisions prohibiting later division and distribution of the land; (4) awarding one or both permits to the most logical heir who can make the most beneficial use of the permits; or (5) dividing one or both of the permits, but only if the resulting division, when combined with other land and grazing permits owned by the awardee in the same district, are large enough to be productive and economically viable.

To the extent that the heirs can cooperate, this Court prefers a customary trust for the benefit of the family. Those heirs who cannot cooperate must be compensated with assets from the estate in the approximate value of their interests in the land use and grazing permits. However, even if such compensation is impossible, Navajo land policy still precludes the piecemeal division of productive land. Further, those heirs who have not maintained a connection with the land may be included as beneficiaries of a customary trust, or may receive other assets as compensation, but they may not receive a separate land use or grazing permit from the estate.

## B. THE CORAL BEADS

The decedent's parents and siblings are entitled to one item of the decedent's personal effects, as selected by the family. Rule 6(1), NRPP. The district court found that, at the time of Mae D. Benally's death, six strings of her beads were set aside by the family for her children. Although Raymond Denetclaw is not entitled to the beads under the letter of Rule 6(1), the district court's ruling is in accordance both with the spirit of Rule 6(1) and with

Navajo custom, whereby family members meet to discuss a person's property matters after that person's death. *See In the Matter of the Estate of Ray Lee*, 1 Nav. R. 27, 30 (1971). Therefore, the district court's order that Ruth Johnson must return the string of coral beads to Raymond Denetclaw is affirmed.

Affirmed in part and reversed and remanded in part.