860 P.2d 756

**F. Richard ZEMKE, Petitioner–Appellee,**

v.

**Patty ZEMKE, Respondent–Appellant.**

**No. 12326.**

Court of Appeals of New Mexico.

May 25, 1993.

Certiorari Denied Aug. 13, 1993.

---

Barbara L. Shapiro and Kelley L. Skehen, the Poole Law Firm, P.C., Albuquerque, for petitioner-appellee.

Robert D. Levy and Kathryn M. Wissel, Levy & Geer, P.A., Albuquerque, for respondent-appellant.

*OPINION*

APODACA, Judge.

Respondent–Appellant Patty Zemke (Wife) appeals the trial court's determination in a divorce action that corporate stock and certain other assets were the separate, rather than community, property of Petitioner–Appellee F. Richard Zemke (Husband). Wife argues that: (1) the trial court should have used a different method of apportioning the stock; (2) a community lien should have been imposed on Husband's separate stock; (3) Husband's "recapitulation" theory to prove the existence of a separate property interest in certain assets was insufficient to trace his separate property interest; and (4) Husband failed to rebut the presumption that certain assets acquired during the marriage were community property. We conclude that substantial evidence supports the trial court's characterization of the stock and the other assets, and therefore affirm the trial court's decision.

FACTS

I. *The Division of the Corporate Stock.*

In November 1964, Husband, together with George Gardner and two other managers at Reynolds Electrical and Engineering Company (REECO), incorporated Gardner–Zemke Company (Gardner–Zemke). Husband bought 2,495 shares of stock in Gardner–Zemke with $24,950 of separate property funds. The parties stipulated that these shares were Husband's separate property. George Gardner also bought 2,495 shares, and his wife, Faye Gardner, bought 10 shares. George and Faye Gardner owned the majority of the shares in Gardner–Zemke from the company's inception until 1985, when George Gardner retired and Husband became the majority shareholder. By January 1, 1965, Husband and the three managers had left REECO and were working full-time for Gardner–Zemke. Husband at that time had acquired a New Mexico general contractor's license, which Gardner–Zemke used and continues to use to qualify as a general contractor.

The parties were married January 28, 1965, and were divorced January 2, 1990. During the marriage, the number of shares of Gardner–Zemke stock held in Husband's name increased because Husband purchased additional shares with salary adjustments and bonuses and because stock dividends were issued. At the time of trial, the total number of shares held in Husband's name was 60,190, or 73.3% of the total stock in Gardner–Zemke. The total worth of all the stock was found to be $10 million. The trial court found that:

10. Stock dividends issued on the original 2,495 shares totaled 36,321 shares so that the original block of shares plus a proportional share of stock dividends results in 38,816 shares (64.-49% of [Husband's] 60,190 shares) held as the separate property of [Husband] at the date of trial.

11. Stock purchased during the marriage and a proportional share of stock dividends on the purchased shares totaled 21,374 shares (35.51% of [Husband's] 60,190 shares) held as community property in the name of [Husband] as of the date of trial.

The trial court further found that the increase in value was due to the financial decisions made by George Gardner and to the combined efforts of the corporate management team, and that Husband intended to preserve his stock in Gardner–Zemke as his separate property. As a result, the trial court awarded Wife the equivalent of 17.75% of the stock and Husband the equivalent of 82.25%. The trial court also denied Wife's request that a community lien be imposed on Husband's separate stock.

At trial, Wife offered evidence that, during the first ten years of Gardner–Zemke's existence, Husband and George Gardner decided that, in order for the company to grow, earnings needed to be retained in the company. Consequently, salary adjustments and bonuses were paid from corporate earnings and timed so that funds were available to purchase additional shares of stock and to pay individual income taxes. Monies paid for the additional shares of stock were placed in the capital stock ac-

count. At other times, an amount of retained earnings would be moved to the capital stock account and stock dividends issued. Wife presented expert testimony that both methods of retaining earnings in the capital stock account were functionally equivalent.

Wife also offered evidence that, during this time, Husband was not fully compensated for his labor. She alleged that Husband earned $225 per week at REECO, but only $150 per week at Gardner–Zemke. She recognizes that he also received salary adjustments or bonuses, but asserts that these were usually timed to allow for the purchase of additional shares of stock. She also points to documentary evidence that Husband was inadequately compensated. A deferred compensation agreement prepared in 1974 and signed by Husband stated that he had not been adequately compensated in the first ten years of the corporation. Documents prepared by Gardner–Zemke in the early 1980s, in response to a claim by the Internal Revenue Service that Husband had been overcompensated, also stated that Husband was undercompensated in the early years of the corporation. However, Wife did not offer any evidence of the amount she claims Husband's salary should have been.

There was also evidence that the Gardners owned the controlling shares of stock until 1985, when George Gardner retired. George Gardner was president of Gardner–Zemke and Husband presented evidence that Gardner made most of the financial decisions. From its initiation, the company used a conservative method of accounting, and it reserved retained earnings and cash each year so that it could operate and grow. This was a necessary practice because of the inherent risks of the public contracting construction business. The trial court found that the retention of profits as retained earnings and the issuance of stock dividends were done for good business reasons.

There was also evidence that Husband earned more at Gardner–Zemke than he had as assistant district manager at REECO. The trial court found that, although Husband's weekly wage was lower, his annual compensation was higher. Some corporate minutes said that he was undercompensated, based on the weekly wage, but other minutes spoke of the annual salary adjustments as raising him to adequate compensation. Additionally, not all of the salary adjustments were used to buy stock. In the first five years, Husband received $76,000 in salary adjustments and bought $26,000 worth of stock, which was admitted to be community property.

Based on industry studies from the National Electrical Contractor's Association, Husband presented expert testimony comparing Husband's annual compensation with managers at similar levels in similar companies. The expert concluded that Husband was adequately compensated. The trial court found that Husband may have been undercompensated during 1971 to 1974, but that any deficiency was compensated for by excess salary paid in 1982 and 1983. During the marriage, Husband was paid $3,868,449.49 as wages, bonuses, and salary adjustments, plus deferred compensation in a profit-sharing account worth $964,267 at the time of trial.

At trial, Husband presented expert testimony tracing the earnings on each share of Gardner–Zemke stock. Husband's expert assumed that the initial block of stock was separate property and that the subsequently purchased stock was community property. The stock dividends were treated as proportional earnings on each block of stock. He then calculated the percentage interest of Husband's initial block of stock and the community stock for each year and at the time of trial, based upon the corporate tax returns and financial statements, the list of stock acquisitions from the corporate books, and other information. Husband calculated the value of the corporate stock as of the trial at book value based on a formula set forth in a stock option agreement. Under this approach, the community investment in shares was calculated at $43,396.

II. *The Division of Assets Acquired Between 1974 and 1979.*

Between 1974 and 1979, Gardner–Zemke operated as a Subchapter S corporation,

and cash dividends were paid to shareholders in the period 1975 to 1980. During that time, the parties acquired numerous properties. Husband acknowledged that his records were incomplete because approximately five years before the divorce, after consultation with his accountant and attorney, Husband had discarded or destroyed many of his records. However, he did produce many other records, including tax returns, W–2 forms, bank records of the joint household account, Gardner–Zemke financial statements, current bank statements, forty investment notebooks, and corporate minutes.

Husband presented evidence that a tax-shelter investment plan was instituted to avoid taxes on the cash dividends that were to be received. Between 1975 and 1979, Husband received approximately $1,621,000 in cash dividends. He also received $721,000 for services rendered to Gardner–Zemke during that period. He testified that the dividends were deposited into three bank accounts. Two, a Merrill Lynch account and a First National Bank account, contained only Subchapter S and investment proceeds; the third, the Sunwest Custom account, contained mixed funds. He testified that most of the investments were purchased out of these accounts.

Based on his review of his records and his knowledge of the parties' finances, Husband compiled Exhibit 7 as a supplement to his testimony. Exhibit 7 purports to show that, during the period that Subchapter S dividends were received, community expenses consumed his regular salary and bonuses and, consequently, the Subchapter S dividends were the only funds available for the investments. Wife objected to the admission of Exhibit 7. The trial court admitted the exhibit, ruling that Wife's objections went to the weight and not to the admissibility of the exhibit.

DISCUSSION

I. *Standard of Review.*

■ This Court reviews the findings under a substantial evidence standard. *See Fenner v. Fenner*, 106 N.M. 36, 41, 738 P.2d 908, 913 (Ct.App.), *cert. denied*, 106 N.M. 7, 738 P.2d 125 (1987). If evidence exists to support the findings, the conclusion of law must be upheld, absent an abuse of discretion. *Smith v. Smith*, 114 N.M. 276, 280, 837 P.2d 869, 873 (Ct.App. 1992). When there is conflicting evidence, on review the appellate court considers the evidence in the light most favorable to the prevailing party and indulges in all reasonable inferences that can be drawn from the evidence in support of the judgment. *Corley v. Corley*, 92 N.M. 716, 718, 594 P.2d 1172, 1174 (1979).

■ Wife suggests that this Court may determine the facts and draw its own conclusions because documentary evidence is involved. We believe Wife's suggestion is too broad. That principle applies only "[w]hen the issue to be determined rests upon the interpretation of documentary evidence." *Arch, Ltd. v. Yu*, 108 N.M. 67, 71, 766 P.2d 911, 915 (1988). Where oral testimony is involved, it is well established that " '[o]nly the trier of facts may weigh evidence, determine the credibility of witnesses, reconcile inconsistent or contradictory statements of witnesses, and decide where the truth lies.' " *Beneficial Fin. Co. v. Alarcon*, 112 N.M. 420, 423–24, 816 P.2d 489, 492–93 (1991) (quoting *Lewis v. Bloom*, 96 N.M. 63, 64, 628 P.2d 308, 309 (1981)). Both oral testimony and documentary evidence were presented in this case. We thus reject Wife's contention that this Court can make independent findings based on the documentary evidence.

II. *Apportionment of the Stock.*

Wife challenges the trial court's apportionment of the Gardner–Zemke stock held in Husband's name. The parties stipulated that the stock Husband bought before the parties married was his separate property; Husband conceded that the stock he purchased with salary bonuses and adjustments during the marriage was community property. At issue, then, is the apportionment of the shares received as stock dividends.

Wife first argues that the trial court applied an improper method of apportionment and that a larger proportion of the

stock should have been considered community property. Second, she apparently argues that, even if the stock was separate property, a community lien should have been placed upon the stock.

### A. *Method of Apportionment.*

■ Wife's first argument focuses on the trial court's characterization of the stock dividends as Husband's separate property. In New Mexico, property " 'takes its status as community or separate property at the time and by the manner of its acquisition.' " *Michelson v. Michelson*, 89 N.M. 282, 288, 551 P.2d 638, 644 (1976) (quoting *McElyea v. McElyea*, 49 N.M. 322, 325, 163 P.2d 635, 637 (1945)). The 2,495 shares bought by Husband before the marriage were indisputably his separate property. *See* NMSA 1978, § 40–3–8(A)(1) (Repl.Pamp.1989). The separate estate also includes "the rents, issues and profits" of the separate property. *See* § 40–3–8(C). Dividends from separately invested stock are generally considered "rents, issues and profits" of the separate estate. *See Conley v. Quinn*, 66 N.M. 242, 249–50, 346 P.2d 1030, 1034 (1959). Once the property's separate character has been established, it maintains that character until it is shown to be community property by direct and positive evidence. *Bayer v. Bayer*, 110 N.M. 782, 786, 800 P.2d 216, 220 (Ct.App.), *cert. denied*, 110 N.M. 749, 799 P.2d 1121 (1990). Any increase in the value of separate property is presumed to be also separate unless rebutted by direct and positive evidence that the increase was due to community funds or labor. *Id.* Husband presented substantial evidence tracing the stock dividends issued on the separate stock and the community stock. Wife does not direct us to any evidence to rebut the presumption that the dividends issued on Husband's separate stock were also his separate property. We thus conclude that the trial court's division of the stock was supported by substantial evidence.

Wife argues that, to accomplish substantial justice, the trial court should have allocated the stock so that Husband received a reasonable return on his investment and then allocated the remainder of the stock to the community. *See Gillespie v. Gillespie*, 84 N.M. 618, 621–22, 506 P.2d 775, 778–79 (1973). We are not persuaded by Wife's authorities that the trial court abused its discretion, since we have concluded that substantial evidence supported its division of the separate and community stock. As noted in *Gillespie*, "[i]t is impossible to lay down hard and fast guidelines in apportioning assets between the separate estate of a conjugal partner and the community." *Id.* at 622, 506 P.2d at 779; *see also Dorbin v. Dorbin*, 105 N.M. 263, 267, 731 P.2d 959, 963 (Ct.App.1986) ("The New Mexico Supreme Court has repeatedly held that there is no one method of apportionment to the exclusion of others."). The cases cited by Wife are distinguishable in that they involve sole proprietorships, personally owned real estate, or professional practices into which one spouse expended community effort, rather than a corporation that the spouse both drew a salary from and owned shares in. *See, e.g., Portillo v. Shappie*, 97 N.M. 59, 636 P.2d 878 (1981) (community labor and funds used to improve wife's separately owned house); *Jones v. Jones*, 67 N.M. 415, 356 P.2d 231 (1960) (sole proprietorship in which both spouses worked without receiving salaries); *Mitchell v. Mitchell*, 104 N.M. 205, 719 P.2d 432 (Ct. App.) (professional accounting practice), *cert. denied*, 104 N.M. 84, 717 P.2d 60 (1986). Thus, these cases do not compel the conclusion that the trial court abused its discretion in characterizing the stock derived from Husband's original investment as his separately owned property.

### B. *Imposition of a Community Lien.*

Wife's second argument is that Husband was undercompensated during the early years of the marriage. Thus, she contends that the trial court should have imposed a lien for the value of Husband's services on his separate stock.

■ "The propriety of imposing a community lien against the separate property of a party depends upon whether evidence supports a determination that community skill and labor have resulted in an increase

in the value of the Corporation and whether such efforts were uncompensated or undercompensated." *Smith*, 114 N.M. at 282, 837 P.2d at 875. The community is entitled only to fair compensation for the value of the spouse's labor on the separate property. *Michelson*, 89 N.M. at 287–88, 551 P.2d at 643–44. Additionally, the party alleging entitlement to the lien has the burden of proving the amount of such compensation. *Id.* New Mexico has consistently followed *Katson v. Katson*, 43 N.M. 214, 89 P.2d 524 (1939), in determining whether, in situations where a spouse had an interest in a corporation that also employed the spouse, the community has a lien on the spouse's separate property in the corporation. In *Katson*, our Supreme Court recognized that, in such situations, the community had a claim on the value of the spouse's services to the corporation and, if the spouse was not compensated for his services to the corporation, to the increase in value of the corporation attributable to the spouse's services. However, *Katson* stated that, based on the facts in that case, "[a]s the property was never wholly owned by him, and he was paid definite salaries for his services, in the absence of definite evidence of their value, it will be presumed that the salary paid was the value of the services." *Id.* at 217, 89 P.2d at 526.

■ Under the facts of this appeal, Husband did not wholly own the corporation and, during the time Wife contends he was undercompensated, he did not own a controlling share of the corporation. Although Wife presented evidence that Husband was undercompensated during that time, she has not drawn our attention to any definite evidence of the value of the services. Additionally, Husband presented evidence that he was adequately compensated. In such a situation, the trial court was free to accept Husband's evidence and reject Wife's evidence. *Jay Walton Enters., Inc. v. Rio Grande Oil Co.*, 106 N.M. 55, 60, 738 P.2d 927, 932 (Ct.App.) (where evidence is conflicting and trial court adopts finding on contested issue, fact that there may be evidence upon which court could have adopted different finding does not constitute error), *cert. denied*, 106

N.M. 7, 738 P.2d 125 (1987). We thus conclude that substantial evidence supported the trial court's apportionment of the corporate shares and its determination that the community did not have a lien on the shares determined to be Husband's separate property.

### III. *Husband's Separate Property Interest in Certain Assets.*

Wife claims that the trial court erred in holding that Husband had a separate property interest in certain assets acquired during the marriage between 1975 and 1979. First, she argues that Husband's "recapitulation" theory, relied on because he could not directly trace his separate property interest, has not and should not be adopted in New Mexico. Second, she contends that, even if the recapitulation theory is appropriate, Husband nonetheless failed to meet his burden of proving a separate property interest.

### A. *The Recapitulation Theory.*

■ We first address Wife's contention that a "recapitulation" theory is per se unacceptable in New Mexico. Based on our discussion below, we conclude that the strict tracing rule for which Wife argues is not the law in New Mexico. Rather, we believe that the cases on which Wife relies indicate that the evidence required and the method used to apportion separate and community estates depend on the facts presented. Additionally, as noted below, our review of New Mexico law indicates that the "recapitulation" method has been recognized as an appropriate method for determining the existence of a separate property interest.

In *Leckie v. Leckie*, 101 N.M. 254, 680 P.2d 635 (Ct.App.1984), the parties owned a joint account into which they commingled community and separate funds. Funds from the account were expended on both separate property of the husband and on community property. The trial court had determined that the community had a lien on the husband's separate property equal to the amount of funds expended on such

separate property. This Court reversed, holding that there was not substantial evidence to support the determination of the lien. This holding was based on our conclusion that uncontradicted evidence showed that the rent money derived from Husband's separate property, which also was deposited into the account, exceeded the amount spent on the separate property. *Id.* at 256, 680 P.2d at 637. *Leckie* stated that, assuming separate funds went into the community and community funds were expended on the husband's separate property, equity required the community to give credit to the husband for the use of separate funds. Alternatively, we stated in *Leckie* that, assuming that husband's separate funds retained their separate character when placed in the joint account, the expenditures on the husband's separate property were expenditures of separate funds, and no community funds were expended. *Id.*

Similarly, in *Corley v. Corley*, 92 N.M. 716, 594 P.2d 1172 (1979), evidence was presented that community and separate funds had been commingled. *Id.* at 720, 594 P.2d at 1176. However, because there was uncontradicted evidence that community expenditures had exceeded community income, our Supreme Court held that the trial court erred in not making a finding to that effect. *Id.* The Court held that the mere commingling of community and separate property did not change the character of the separate property to community property. *Id.* From this holding, we conclude that in *Corley*, once it had been shown that community expenditures exceeded community income, the remainder of the funds in the commingled accounts were considered separate.

In *Moore v. Moore*, 71 N.M. 495, 379 P.2d 784 (1963), the trial court had determined that there was a community lien of $9,000 against the husband's separate property because it found the husband had expended $9,000 in community funds on the separate property. Our Supreme Court upheld the judgment. It analyzed the community's income and expenses and the husband's income and expenses, and, because the husband had failed to show that $13,650.38 of community income had been spent on community expenses, concluded that substantial evidence supported the trial court's award. *Id.* at 501, 379 P.2d at 788.

In *Campbell v. Campbell*, 62 N.M. 330, 310 P.2d 266 (1957), the wife relied primarily on the presumption that property acquired during the marriage was community property. *Campbell* held that "the contestant asserting the separate character of the property has not only the burden of going forward with his evidence, but of establishing separate ownership by a preponderance of [the] evidence." *Id.* at 341, 310 P.2d at 273. The Court focussed on all the circumstances and concluded that the husband had demonstrated that his interest in a partnership was acquired by gift and therefore was his separate property. *Id.* at 348, 310 P.2d at 278. *Campbell* concluded that "when it is established that community funds equal or fall short of community expenditures, property acquired by the husband, having independent funds at his disposal, should be held, by legitimate inference, to be his separate property." *Id.* at 358, 310 P.2d at 284. The Court also stated that, "in [the] absence of an arrangement or agreement to the contrary, community earnings are chargeable with community expenses." *Id.*

In *Campbell*, the husband attempted to rely on this principle to show that all of his holdings were his separate property. However, the Court rejected his contentions because there were reasons for the trial court not to rely on the husband's computations. *Id.* at 358–60, 310 P.2d at 284–86. This was not a rejection of the principle itself. In contrast, in this appeal, Husband testified that, in computing the community expenses, he relied on documents that he possessed. Wife had the opportunity to analyze those documents and to controvert Husband's determinations. She made no attempt to do so.

We do not agree with Wife that *Mitchell* rejected the recapitulation theory. In that case, the husband sought reimbursement for separate funds allegedly spent for the benefit of the community. *Id.,* 104 N.M. at

212, 719 P.2d at 439. The trial court had denied reimbursement and concluded that the separate assets had been so commingled with community assets that they had lost their separate character and were impossible to trace. *Id.* at 213, 719 P.2d at 440. The evidence offered by the husband in that case was apparently much less than is present in this appeal. Additionally, we do not read *Mitchell* as rejecting documentation similar to what was presented here. Rather, although in *Mitchell* the husband could not trace any of the funds into any particular account or prove that funds were expended on particular assets, *see id.*, here, Husband presented evidence of a particular investment plan for the dividends and linked the receipt of the dividends to expenditures for certain assets.

On the basis of these cases, we conclude that a "recapitulation" method (to determine whether community expenditures depleted community income, thus requiring a ruling that remaining funds are deemed one spouse's separate property) is acceptable in New Mexico. Adoption of this method does not relieve the spouse asserting the separate property interest of the burden of proving that interest by a preponderance of the evidence; it simply recognizes that generally not every piece of paper will be retained, especially in a marriage lasting a long period. Additionally, we believe that the method has essentially been approved by our Supreme Court, *see Hayner v. Hayner*, 91 N.M. 140, 141–42, 571 P.2d 407, 408–09 (1977); this Court is therefore bound by that determination. *See Alexander v. Delgado*, 84 N.M. 717, 718–19, 507 P.2d 778, 779–80 (1973). We thus will not consider Wife's policy arguments against allowing the theory.

### B. *Husband's Burden of Proving Separate Property Interest.*

A determination that Husband's method of proving his separate property interest is acceptable in New Mexico does not dispose of Wife's second contention: that he failed to meet his burden of proof in rebutting the presumption that assets acquired during the marriage are part of the community. *See* NMSA 1978, § 40–3–12(A) (Repl. Pamp.1989). Wife's argument specifically focuses on the admissibility of Husband's Exhibit 7, on which she claims Husband's case depended.

Exhibit 7 was prepared by Husband and represents his distillation of the parties' finances from 1974 to 1980. It purports to show (1) that community expenditures exceeded the amount Husband received as salary and bonuses, and (2) that certain investments were purchased from the cash dividends. Wife contends that the exhibit was not admissible under SCRA 1986, 11–1006 as a summary because (1) not all the underlying documents were available, (2) portions of the exhibit were speculation, and (3) the exhibit was not credible. In response, Husband contends that portions of the exhibit were admissible under different rules of evidence.

We believe it is unnecessary to analyze Exhibit 7 line by line to determine whether each portion was admissible, because we conclude that, although Exhibit 7 by itself is insufficient to support the trial court's findings, Husband produced substantial evidence to support the trial court's conclusion that the assets were purchased with the dividends. As Wife concedes, Exhibit 7 was a picture of Husband's theory. The trial court made it clear it did not rely on the substance of the exhibit, but used it merely as a summary of the calculations to which Husband testified. SCRA 11–1006 allows such use of a summary of other evidence. *United States v. Williams*, 952 F.2d 1504, 1519 (6th Cir.1991); *United States v. Poschwatta*, 829 F.2d 1477, 1481 (9th Cir.1987). Diagrams and exhibits to illustrate testimony are admissible so long as they are not misleading. *See Cantrell v. Dendahl*, 83 N.M. 583, 586–87, 494 P.2d 1400, 1403–04 (Ct.App.1972). Husband testified concerning his analysis of the numerous documents that he still possessed, including all tax returns, W–2 forms, investment notebooks, and some records of the various checking accounts, including complete records of the checking account used for family expenses. He used the original documents to compile Exhibit 7. Exhibit 7

was in part a summary of existing documents and in part an expression of Husband's opinions. *See* SCRA 1986, 11–701 (opinion testimony of lay witness admissible); SCRA 11–1006 (summary of documents admissible).

Additionally, even if Exhibit 7 were inadmissible, we would conclude there was no error because of the other evidence available to support the trial court's findings. Husband's testimony regarding the investments and his intent was competent evidence to support the trial court's determination. *See Corley*, 92 N.M. at 718, 594 P.2d at 1174; *Sparks v. Sparks*, 84 N.M. 267, 268–69, 502 P.2d 292, 293–94 (1972); *see also Mix v. Mix*, 14 Cal.3d 604, 122 Cal.Rptr. 79, 85, 536 P.2d 479, 485 (1975) (in bank). Other evidence corroborated his testimony. Wife also had the opportunity to cross-examine Husband concerning his allocation of community expenses and the other figures used in his calculations.

Wife argues that Exhibit 7 was not credible because it was internally inconsistent. She points specifically to the fact that a portion of the dividend income was not allocated to the community as it should have been. We believe that these objections misconstrue what Husband was attempting to prove with Exhibit 7. He was not attempting to prove that certain separate property funds were used to purchase the investments; rather he was attempting to show that the investments were purchased with the cash dividends, which were admittedly both community and separate. Once Husband had proven by a preponderance of the evidence that his separate funds were used in part to buy the assets, it was Wife's burden to prove that those separate funds had been transmuted into community property. This she failed to do, relying instead on the presumption that assets purchased during the marriage are deemed community property.

Husband proved that, between 1975 and 1979, Gardner–Zemke paid out approximately $1,621,000 in dividends in his name. His compensation in wages and salary was about $721,000. He also presented evidence and testimony that community expenses were approximately $784,000 for the same period. A portion of the expenses were taxes of $488,284 actually paid. More than $400,000 of the taxes were paid on Husband's wages and bonuses alone. He concedes that a portion of the remaining $80,000 in taxes must have been paid on the cash dividends that were his separate property. Nonetheless, it appears that community expenses approximately equalled or exceeded the amount received as Husband's salary and bonuses. Additionally, there was undisputed evidence that an investment plan had been implemented to shelter the income from the dividends and that the investments were purchased at about the same time that dividends were available to purchase them. Husband also testified that he intended to keep his separate property separate. Thus, substantial evidence supported the trial court's conclusions that Husband had proved, by a preponderance of the evidence, that his separate dividends had been invested in the assets and that Wife failed to prove that those dividends were transmuted into community property.

CONCLUSION

Because we conclude that substantial evidence supported the trial court's division of the parties' assets, we affirm.

**IT IS SO ORDERED.**

BIVINS and BLACK, JJ., concur.